[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 885 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 886 
Appellant was indicted and convicted under a two-count indictment charging him with two separate capital felonies: (1) the nighttime burglary of an occupied dwelling when one of the occupants was intentionally killed, and (2) with murder in the first degree wherein two persons were intentionally killed by one or a series of acts. These offenses are codified at Code of Alabama, §§ 13A-5-31 (a)(4) and 13A-5-31 (a)(10) (1975) as part of Alabama's Death Penalty Statute as it has been interpreted by our Supreme Court in Beck v. State, 396 So.2d 645 (Ala. 1980).
Omitting its formal parts the indictment reads as follows:
 "The Grand Jury of said County charge that before the finding of this Indictment, Lloyd Duncan, whose name to the Grand Jury is otherwise unknown, did on, to-wit: February 13, 1980, in the nighttime, with intent to commit a felony, to-wit: Murder, knowingly and unlawfully break into and enter an inhabited dwelling, to-wit: a mobile home, the property of Eva Sims, which was occupied by Eva Sims, Eric Sims and Neal Sims, persons lodged therein, and while effecting entry or while in the inhabited dwelling or in immediate flight therefrom, said Lloyd Duncan was armed with a deadly weapon, to-wit: a 22 caliber rifle, and during the course of said nighttime burglary, Lloyd Duncan did intentionally cause the death of another person, to-wit: Eva Sims, by shooting her with a 22 caliber rifle, in violation of § 13A-5-31 (a)(4) of the Code of Alabama, as last amended, against the peace and dignity of the State of Alabama.
"COUNT II
 The Grand Jury of said County charge that before the finding of this indictment, Lloyd Duncan, whose name to the Grand Jury is otherwise unknown, by one or a series of acts, did on, to-wit: February 13, 1980, unlawfully and with malice aforethought, intentionally cause the death of another person, Eva Sims, by shooting her with a 22 caliber rifle, and did unlawfully and with malice aforethought, intentionally cause the death of another person, Eric Sims, by shooting him with a 22 caliber rifle, in violation of § 13A-5-31 (a)(10) of the Code of Alabama, as last amended, against the peace and dignity of the State of Alabama."
The jury returned two separate verdicts in this case finding appellant guilty as charged under each count in the indictment. A sentence hearing was then conducted pursuant to the sentencing procedures outlined in Beck, supra. After considering the aggravating and mitigating circumstances, the jury was unable to agree on a sentence of death for either of the capital crimes it determined appellant had committed. Accordingly, the trial court sentenced appellant to two terms of life imprisonment in the penitentiary without parole, the terms to run consecutively.
Appellant is represented on appeal by the same court-appointed counsel that represented him in the circuit court. He has also been furnished with a free transcript.
There is no question that appellant killed Eva Sims, her four-year-old son, Eric, and wounded her eight-year-old son, Neal, inside *Page 887 
Ms. Sims' mobile home on the night of February 13, 1980, by shooting them with a .22 caliber rifle. The stage was actually set for this senseless tragedy some two and a half years earlier, however, when appellant was indicted and convicted for the rape of Eva Sims. A transcript of the rape trial has been included in the record before us; it was admitted into evidence during the sentencing phase of the instant trial as part of the aggravating and mitigating circumstances for the jury to consider. Attempts by appellant to have the prior transcript admitted during the guilt determining phase were disallowed by the trial court.
For purposes of this opinion it is only necessary to set out that the evidence presented at the rape trial was conflicting. Ms. Sims maintained that, during the early morning hours of May 15, 1977, appellant broke into her house and raped her. Appellant's version was that Ms. Sims consented to having sexual relations with him that night as she had on several prior occasions. The jury resolved the issues unfavorably to appellant and fixed his punishment at ten years' imprisonment. As it is not the function of this court to reweigh evidence decided by the jury, Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), appellant's conviction for the rape of Ms. Sims was affirmed. Duncan v.State, 355 So.2d 745 (Ala.Cr.App. 1978). Appellant served twenty-two months of the ten year sentence and was placed on parole.
Upon being paroled appellant returned to his parents' home in the High Point community to live on January 7, 1980. After his return home, appellant's family noticed a discernible change in his personality. Appellant "acted like he was worried" and "didn't want to talk to nobody." He made frequent trips from the house to the field for no apparent reason on almost a daily basis. "He seemed to be withdrawn" and he never mentioned Eva Sims. This behavior continued until the night appellant committed the present offense.
Ron C. Foster testified that he arrived at Eva Sims' mobile home "just to visit" her around 7:30 p.m. on February 13, 1980[1]. Foster stated that "no one was there except Eva." He testified that they "talked" and watched television. Foster had been to Ms. Sims' mobile home on five or six occasions. He described their relationship as "just friends, good friends."
Around 8:15 p.m. Foster testified that Ms. Sims' Doberman dog began to bark outside the mobile home. He opened the back door, but didn't see anyone or any movement. Shortly after 8:30 p.m. Ms. Sims' sons, Neal and Eric, were delivered home by Ms. Sims' parents. The boys had gone to visit their grandparents around 5:30 p.m. that afternoon. Ms. Sims' parents' home was located approximately one hundred yards from her mobile home. Neal and Eric took their baths, watched television and went to bed around 9:00 to 9:15 p.m.
Foster remembered leaving Ms. Sims' mobile home at 9:27 p.m. Foster stated that Ms. Sims was "sick" in bed experiencing "one of those monthly things." He handed her a pistol which she placed under her pillow just before he left. Ms. Sims' bedroom and her sons' bedroom were at opposite ends of the mobile home. Foster testified that he was driving a light tan El Camino pickup truck.
Neal Sims, who was nine years old at trial, testified that he and Eric had gone to sleep in their bedroom when they were awakened by their mother. "She come in yonder and wanted us to get up . . . said, boys, get up, somebody's breaking in." Neal stated that he next saw a man standing at the doorway to his bedroom and that his mother "shot at him" with her pistol. Neal testified that the man then "starting shooting." He and Eric were "in the bed" and his mother was "on the bed" when appellant began firing. Neal further testified *Page 888 
that the overhead light to their bedroom had been turned out when he and Eric went to sleep. The only light in the bedroom came from an adjoining bathroom where the door had been left cracked.
After the shooting ended, Neal realized that he had been hit by bullets in several places including his chest. Appellant asked Neal where the car keys were to his mother's car, but was unable to crank the car. Neal remembered appellant making him lie down and putting a blanket over him and telling him "he was gonna go get help."
Eva Sims' mother, Nora Bowden, testified that she went home after taking Neal and Eric back to her daughter's house trailer. Later that evening Mrs. Bowden heard dogs barking and gunshots from the direction of her daughter's trailer. She attempted to call Eva but "didn't get any answer." Mr. and Mrs. Bowden then drove to the trailer and saw Neal "standing in the door." Mrs. Bowden discovered Eva and Eric in the bedroom.
Mrs. Suzanne Thomas, a registered nurse, testified that she worked the night shift at Guntersville Hospital on February 13, 1980, and that she saw Chief Deputy Lacy Galloway of the Marshall County Sheriff's Department with appellant in the emergency room around 11:10 p.m. Mrs. Thomas assisted in treating appellant for cuts to his arms and a superficial gunshot wound to his abdomen. She described appellant as an "excited and disturbed individual" who was "both verbally and physically active." "He kept asking how were the children, how were the children, I didn't mean to hurt the children." Mrs. Thomas stated that appellant referred to the woman who was killed as a "whore."
Chief Deputy Galloway testified that he first saw appellant on the night of February 13, 1980, in the emergency room at Guntersville Hospital. "He was doing a lot of talking." At that time Galloway advised appellant of his constitutional rights under Miranda and repeatedly told appellant "to not talk about it." Despite the repeated warnings appellant made a statement in the emergency room "that he meant to kill Eva Sims." Appellant was very concerned about the children. "He said he didn't know the kids was in the house." Galloway and appellant left the hospital around 12:30 a.m. on February 14.
Appellant was transported directly to the Sheriff's office where Galloway again fully advised appellant of his constitutional rights. Shortly after being advised of his rights for a second time, appellant requested to telephone his father. The following telephone conversation between appellant and his father was recorded and its transcription, State's exhibit 72, was admitted without objection.
 "Lloyd Duncan's telephone conversation with his father, Underwood Duncan
 "Duncan: And she shot at me with a pistol two times through the window. I knocked the God damn window down or out and I tried to talk to her. Still tried to talk to her. I didn't even know the kids was there. The God, the whore put the kids between me and her. I didn't even know the kids was in there until I heard one of them holler and I knew I'd done, done, done, done emptied the rifle in there. I don't care about that whore, but you know I wouldn't hurt a kid for nothing in this world. Don't you know it? But, daddy, listen this, this son of a bitch that was there. I don't know who it was. But he, anyway he left and I didn't know the kids was there. I didn't figure the kids was there because her and him in there fucking. I, I stood outside and listened to them. Seen them, seen them running through the house naked and all this shit. I didn't know the kids was there. She shoots at me and then she runs in there with the kids. But I didn't know the kids was in there till I'd done opened, done knocked the window out and on the inside. I didn't even know, I didn't even know I was shot until I'd done emptied the rifle. And then, then here laid one kid and the other one was talking to me, daddy. I tried to help him. Just explain to mama that I didn't mean to kill the kid. Daddy, I didn't. I swear to God I didn't. I didn't even *Page 889 
know the kids was there. That, that bitch. I wouldn't have give a damn if I'd have blowed her brains out a thousand times. I should have done it a long time ago, daddy, but I didn't know those kids was there. But just as long as you and mama, daddy, just as long as you and mama believe me that I didn't mean to hurt the kids. I know, I think one of them is dead. Is that right?
"Lacy Galloway: I, I don't know, Lloyd, for sure.
"Duncan: Eva's dead.
"Lacy: Yeah.
 "Duncan: Eva's dead I know. I don't know about the kids. I know they had them at the hospital while ago. Is that right? I, I'm not sure about the kids. I don't, I don't know. I know they had one of them down there cause I heard, heard the kid crying. But I didn't know the kids was there or I wouldn't, I'd have never went up there. But it's I've got a lot on my mind, but there's one thing I ain't got on my mind no more. She sent me to prison, daddy, for something I wasn't guilty of. I've got that off my mind now. I can rest that. Well, I wasn't guilty of the rape charge. You know that. But I, I got that off my mind anyway now. That killed me for three years, but that's in the past. I want you to, I want to tell you what I want you to do. I want you to get hold of Shirley. I guess you've already talked to her. Well, let me talk to Shirley just a minute then. Well, we'll just let the rough end drag. That's all I can do now. Hey, Shirley I want you to call Hazel and tell her what happened. See if she can find Faye and tell Hazel to tell Faye to write me. Cause I'm, I'm gonna be down here at the jail. Okay. And tell her that I finally get it off of my mind. Okay. And I love all of you. And I'm sorry that things turned out this way. Okay? I'm gonna let you go then. Okay. Bye bye."
Just after the telephone conversation with his father appellant voluntarily made a recorded statement to Chief Deputy Galloway in the presence of Lieutenant Aubrey Beard. The transcript of that statement, State's Exhibit 73, was admitted without objection. It reads as follows:
"INTERVIEW WITH: Lloyd Duncan
"Duncan: They're gonna hang me anyway so . . .
"Lacy: Well, I, I don't know about that now. All right. If you want to talk about it, what time did you go out to the house, Lloyd?
"Duncan: Let me think just a minute. I don't really know cause I ain't got no watch. I don't really know. I, I don't even know what time it is now.
"Lacy: Okay. Do you know about what time you went out to the house?
"Duncan: No. I don't cause I don't, I don't, I ain't got no more watch and I don't . . .
"Aubrey Beard: I don't know if that's good enough or not there.
"Duncan: I don't really know what time it was.
"Lacy: Well, it's twenty-five till one now.
"Duncan: All I know is that I went down to her house to talk to her and, uh, there was another car there and I eased up to the window. I moved some back door steps where I could see into the window. She comes through the house just, uh, had on, uh, something thin. I don't, I don't know if it was a housecoat or nightgown or what it was and then this guy comes through the house right behind her and then I stood outside and I listened to them, you know. They was in there in the bed screwing, carrying on. First one thing and another. Sniggering. Laughing. And she, she sent me to the penitentiary for a rape charge. I think you know about that. I had it on my mind ever since then. And I, that's something I weren't guilty of. So, uh, I left and I went home and I, I got the rifle and I went back and I waited till he left. I don't know what time it is. What time it was at that time. But after he left I went up and I cut her telephone wire. I went around to the back. I believe it was, uh, I believe it was a couch there or something other. *Page 890 
And, uh, I talked to her. I pecked on the window. She, she come in there. She was talking to me. This was at, uh, I believe it was a sink there at the first place I talked to her. About middle way of the trailer I think. And we talked for a minute. Next thing I know God damn she shot through the window. She throwed the gun up. When she did I ducked. And I had the rifle. I walked over here to the, to, uh, I believe it was a couch. I believe it was the window behind the couch. And I knocked the window out and, uh, I believe she shot through the window. I'm not sure. There's probably a bullet hole. I don't know. Then, uh, just, I don't know. I just went crazy and the best I remember I knocked the window out. I think I knocked the window out. Then, uh, I went, uh, went over in the middle of the trailer I believe. I think that was when she shot me. She shot me here. I think, well, he'd done gone then so she's the one that had to shoot me. Then, uh, I was trying to talk to her. I think she had done shot me at that time. And she said something. I don't remember, remember exact words she said. I tried, still trying to talk to her. Then I believe she shot, shot a time or two through the doorway or something. That might have been when she shot me. I, tell you the truth, I didn't even know I was shot till I'd done throwed the rifle up and, you know, and it was empty. And, uh, I flipped the light on I believe. I don't think there was a light on. And this, one of the kids, he come to me. He had a, he had a bullet here in his chest. I believe he had a bullet. Bullet or bullet hole or something here in his chest. And I laid him down and rolled him up in a, a quilt. And she, uh, she was laying in the floor and I, I tried to roll her up or something. Tell you, tell you, just be honest with you I don't, I don't, I don't know. I just, I just went crazy.
"Lacy: Do you know how many times you shot?
"Duncan: Well, I had a 22 automatic and I don't know how many shells I had in it, but I think I emptied it. I don't know. But I, I remember. Now, I, I got her key. I asked the little boy that I rolled up in a quilt where her car keys was at. He told me he thought they was laying on the refrigerator or by the refrigerator or something. I remember I got the keys and I, I tried to start her car. I was gonna, gonna bring him to the hospital and the other kid, he was, uh, he was laying in the bed. And he, he was bleeding bad. And, uh, I couldn't, I couldn't find the right key. It was in the dark. I couldn't find the right key to start her car. So I went back and got in my car and, uh, I went home and I told daddy and them.
"Lacy: Where was your car at?
"Duncan: It was sitting across, across the field up on the highway that goes from High Point to down towards Hyatt. Nixon Chapel. Down that way.
"Lacy: How far was it from her trailer?
"Duncan: Well, it was across the field there. I'd say it was probably three hundred yards.
"Lacy: You parked the car and then walked to the trailer. Right?
"Duncan: And I went, I went to, uh, went back to my car. I couldn't get her car started. I went, I think I went back in to see about the little boy and I told him, you know, to lay still. That I was gonna get him some help. And, uh, I went to home. I told daddy and them to call down here. Tell them what happened. To get an ambulance out there to get the baby. Then I come from daddy's. I come down here. I come in to see you or Rex. But I, I swear to God I didn't know those kids was there. I'd have never fired. I wouldn't have give a damn if she's killed me. I'd have never fired the first shot if I'd known those kids was in there. I swear to God I wouldn't.
"Lacy: What did you, what did you say to her when you were trying to talk through the window at her, to her?
"Duncan: I asked, I asked her why she did me the way she did. I, I screwed this woman from, uh, 1972 up until, September, 1972 up until somewhere around some, somewhere in 1975 and I quit fucking around with her and, uh, in May, April, May *Page 891 
of '77 she sent me to the penitentiary for a rape charge. And I, I tried my best to forgive her and forget it and it just, it just eat at me till it eat me up. And since, since I've been out of the penitentiary I've tried my best to forget it and forgive her and I just couldn't do it. You believe what you want to believe, but I'm telling you the truth.
"Lacy: Well, I . . .
"Duncan: I've tried, I've asked God a thousand times to forgive me and to let me forget it and to forgive her.
"Lacy: I believe you.
"Duncan: But I just, I just, I don't know what it is. I just, it just eat at me until it . . .
"Lacy: You went over there first and, to her trailer to talk to her.
"Duncan: Yeah. I went, I went down there to talk to her. Well, this other car was in the yard and I, that's when I went around and looked at the tag number to see if I recognized who it was. I'm usually pretty good at numbers and I try, if I see a tag number or something or telephone number hell, I ain't got no problem remembering usually. I can remember, but when I, when I went back it just, I, I don't know. It just, here I'd been in the penitentiary. Done twenty-two months for something I weren't guilty of and here she was fucking somebody else and it just, God damn, it just. I don't know. I just went crazy. And I reckon it just eat at me till it just eat me up.
"Lacy: You went back and got the rifle then and come back over there.
"Duncan: Well, when I went and got the rifle I went back with the intention of just talking to her. I, I didn't [know] whether this, whether this other son of a bitch was gonna shoot me or what not, you know. Well, when I get back, by the time I get back down there he leaves, shit, in just a few minutes after I get there.
"Lacy: Do you know what kind of vehicle he was in?
"Duncan: That he was in?
"Lacy: Yeah.
"Duncan: It was a white, uh, El, El Camino I believe. It was built like that. It was a, a car truck or whatever. Built sort of like an El Camino. I give you the . . .
"Lacy: You give me a tag number, but it was registered to a, a Datsun station wagon from Florence, Alabama and then you changed the tag number some and I haven't run it yet to see what the tag number was. If it was right or not. But the first one you gave me was not correct.
"Duncan: I think it was, uh, shit. CDV 290. Or DVD 290 or something like that.
"Lacy: Okay. I, I haven't run the last one, but I will.
"Duncan: But that, that was who, that was whoever that belongs to that was whoever was there. I don't . . .
"Lacy: Okay. Now you have . . .
"Duncan: I'm not sure.
"Lacy: You have told me this because you wanted to. Is that correct?
"Duncan: I'm telling you just, I'm telling you just like it is. I'm, I've got nothing to hide. I'm telling you just like it is. She just . . .
"Lacy: When I walked into the hospital out there you said you had called for me to come. Is that correct?
"Duncan: It just, I, I kept this on my mind for almost three years. It just, it just eat me up till I, I just. I wouldn't, I wouldn't hurt the, hurt a kid for nothing in this world, but I didn't know the kids was in there.
"Lacy: Well, out there at the hospital you told me that you meant to shoot her. That you meant to kill her. Is that right?
"Duncan: No. I didn't. Now I didn't mean to kill her. I, when I, when she shot. She, she was shooting at me and I, I just shot back more or less to scare her. I didn't even have no idea that I had hit her. This was, this was in the dark and I, I flipped the light on. There was one baby laying here in the bed. One in the floor and she *Page 892 
come crawling out of the bed and fell in the floor.
"Lacy: Did she ever say anything to you after you shot?
"Duncan: She just looked up at me and tried to say something and I don't know. But like I said when I, I shot into a dark room. I didn't even know the kids was in there. If I'd have knowed they was in there I'd have blowed my own brains out before I'd hurt a kid. I love kids as much as any human on this earth.
"Lacy: Out there at the hospital you asked me not to leave you. Do you recall that? For me to stay with you out there.
"Duncan: Yeah. Well, I wanted, I wanted you to stay with me because there weren't nobody else there that I knew.
"Lacy: Well, I told you I'd stay with you, didn't I?
"Duncan: That's right.
"Lacy: And I did. Is that right?
"Duncan: That's right. You did. And I appreciate it, too. Cause there's, I know, I know. You can imagine, you can imagine how upset my family is.
"Lacy: Well, I can understand, Lloyd, and I told you I'd stay with you and I wouldn't leave you.
"Duncan: I appreciate your doing it cause I, I didn't, I didn't know nobody else out there. I didn't, I didn't know where they are getting medical attention or what not.
"Lacy: Okay. Now what you've told me at the hospital and here at the office has been voluntarily. Is that right?
"Duncan: That's right.
"Lacy: I haven't forced you to tell anything.
"Duncan: You haven't forced me to tell you anything. I'm telling you, I'm telling you cause I need to talk to somebody. But you hadn't, you hadn't forced me to say nothing.
"Lacy: In fact I've let you do most of the talking.
"Duncan: That's right. You sure have and I appreciate you letting, letting me talk to you. I know, I know you're recording it and I know you're gonna use it against me, but all I can do is take the witness stand and I'm gonna tell, tell it just like it was.
"Lacy: Like I told you the reason I'm . . .
"Duncan: If they hang me, they'll just have to hang me, but I, I did, I don't know. I, I know I didn't do what was right, but I just, I just went crazy.
"Lacy: Well, the reason I told you I was gonna record it because we wouldn't have no misunderstanding on what was said.
"Duncan: Yes, sir. That's, that's right.
"Lacy: Because the tape will speak for itself.
"Duncan: That's right.
"Lacy: Have you got anything else to add to this?
"Duncan: Uh, no. I, I think I said about everything that I could say. _____ where I'm still bleeding. This coat is making me bleed.
"Lacy: Lloyd, I want to ask you one question now about what did you do with your gun now after this shooting was over with?
"Lloyd: Well, now the best I remember I believe the gun was laying there in the floor.
"Lacy: You left it out at the scene.
"Duncan: Yeah. Best, best I remember it was laying it was laying there in the floor.
"Lacy: Okay. What kind of gun was it?
"Duncan: A .22 rifle.
"Lacy: Do you know the brand name?
"Duncan: No. I just, I don't remember. It was a .22 automatic.
"Lacy: Okay.
"Duncan: Is the gun not out there?
"Lacy: I haven't been out there. I just wanted to ask you.
"Duncan: Well, the best I remember the gun, the gun was laying there in the floor I believe.
"Lacy: Okay.
"Duncan: I'm not, I'm not sure. I'm just guessing cause I . . . *Page 893 
"Lacy: It, it may be out there now. I haven't . . .
"Duncan: I'll be honest with you. I . . .
"Lacy: I haven't been there.
"Duncan: I, I was crazy as hell.
"Lacy: Okay. Are there anything else that you want to tell now?
"Duncan: No. I, I guess that's about it.
"Lacy: Okay."
Appellant subsequently made another statement in the District Attorney's office on the afternoon of February 14. Appellant was again given his Miranda warnings prior to questioning. And the voluntariness of this statement, like his other inculpatory statements, is undisputed. There is no need to set out verbatim this rather lengthy statement which was admitted without objection as State's Exhibit 74. In pertinent part appellant continued to profess his innocence concerning the prior rape charge. Appellant insisted that even Ms. Sims' husband knew he was not guilty of rape:
 "He told me sitting right up there at the bar, he said I know you didn't rape her, but said there's nothing I'm going to do to help you. He said I don't know of anything I can do to help you. And just sort of laughed about it. That was his way of getting back at me."
Appellant also denied that he had ever telephoned Ms. Sims threatening to kill her for accusing him of rape. Appellant stated further that had he known the children were in the mobile home when he went "to talk" to Ms. Sims "I'd never went up there to start with." He maintained that he shot into the bedroom "just to scare the hell out of Eva."
Law enforcement officers arrived at the scene of the killings at 10:52 p.m. on February 13. Eva Sims' body was found lying in the floor at the foot of Neal and Eric's bed. Her four-year-old son's body was found lying in the bed. Appellant's .22 caliber rifle was found in the bedroom as was Ms. Sims' .38 caliber revolver. The rifle contained four live rounds of ammunition; all six cartridges in the deceased's revolver had been spent.
Coroner Dempsey Hibbs arrived at the mobile home at 11:15 p.m. and determined that the deaths were due to numerous gunshot wounds to both victims. Dr. Joseph Embry of the Department of Forensic Sciences performed autopsies on the two victims. Ms. Sims' autopsy revealed that she had sustained nine gunshot wounds, more than one of which would have been fatal. Four-year-old Eric's autopsy demonstrated that he had received four gunshot wounds, one of which was fatal.
Dr. Embry testified that he also conducted certain tests on the deceased Ms. Sims to determine whether she had engaged in recent sexual intercourse prior to her death. The tests results were negative. Dr. Embry pointed out, however, that the negative tests results were not conclusive that Ms. Sims had not recently engaged in sexual relations. He elaborated that if sexual relations were interrupted before the male reached a climax, or if the male used a condom, or if the female effectively used some method of feminine hygiene following intercourse, the tests results would not be positive. Dr. Embry stated that Ms. Sims "had a tampon in her vagina, so I presume she had started menstruating. There was a small amount of blood on it."
Detailed testimony was admitted from several witnesses describing the damage incurred inside and around the mobile home. Bullet holes were found throughout the trailer and were especially concentrated in the living room and bedroom where the victims were discovered. The window through which appellant had entered the trailer was broken out. The telephone line just outside the mobile home had been completely severed. And the keys to Ms. Sims' automobile were found jammed into the steering column, rather than in the ignition switch.
After the State rested its case appellant moved to exclude the evidence under each count separately and severally on the basis of sufficiency. Appellant specifically contended that the evidence did not prove that Eric Sims was intentionally killed under the capital offense alleged in Count II. These *Page 894 
motions were overruled. Appellant also moved the trial to require the State to make an election as to which of the charges it intended to prosecute for the homicide of Eva Sims. This motion was overruled as well.
Appellant's father, Underwood Duncan, testified in his son's behalf that, on the night of the killings, appellant drove back to the house "blowing the horn" approximately forty-five to fifty minutes after he had left with the rifle. Appellant came to the front porch and "wanted me to call the law and get an ambulance and send up at Evie's." Appellant related to his father that he had shot Ms. Sims and one of her sons but said he didn't know the children were at home.
 "[H]e told us before he left that, if didn't nobody else in the world believe it, he wanted me and his mother to believe that he did not mean to hurt them kids.
. . . .
 ". . . [He] said it was dark up there and he couldn't see and said him and her was shooting at one another, and he said he didn't go to hurt no one. Said he just went up there to find out who pushed the rape case."
Appellant's mother, Helen Duncan, testified that appellant came home at 9:50 p.m. on the night Ms. Sims and her son were killed, loaded the rifle and left without speaking to her. Mrs. Duncan stated that her son was wounded when he came back at 10:35 p.m. that night and reported "that Evie was dead and one of the little boys and one one was wounded." Before he left his parent's home, appellant told them "he'd be all right, to get the children some help."
Jimmy Sims testified that he was Eva Sims brother-in-law at the time appellant was accused of raping her. Outside the presence of the jury, Sims stated that his testimony at the rape trial concerning when he had seen appellant at the VFW Club was incorrect, that he had gotten his days "mixed up." Sims signed an affidavit to this effect for appellant's defense counsel in the rape trial. Sims' affidavit stated that he had seen appellant at the VFW Club on Saturday, the day of the alleged rape, not the Friday before. The State's objection to the admission of this evidence before the jury was sustained.
Virgil Winkles testified that he had known appellant since 1964 and that he had become acquainted with Eva Sims in 1972 when he was living with Jimmy Dobbins. Winkles was on escape from the penitentiary while he lived with Dobbins at Dobbins' mobile home. While on escape in 1972, Winkles worked at Automatic Sprinkler with Danny Sims, Eva Sims' husband. Winkles testified that, during the two months he was out on escape, he saw appellant and Eva Sims alone together at Dobbins' trailer approximately three times. No one ever came with them. Winkles remembered that on the first occasion he saw appellant and Ms. Sims come to the mobile home, "they went to the bedroom after about five minutes."
Barney Davidson testified that he also knew appellant and Eva Sims' ex-husband, Danny Sims. Davidson stated that at the time appellant was accused of raping Ms. Sims he (Davidson) ran the Guntersville VFW Club. Outside the presence of the jury, Davidson testified that, at the time of the rape trial he heard Danny Sims make a statement to appellant at the VFW Club "that he knew that he didn't rape his wife, he knew he'd been going with her." The State objected to appellant's introducing Davidson's testimony concerning the VFW Club conversation in the presence of the jury. The trial court sustained the objection on the basis of hearsay.
Jimmy Dobbins testified that he was appellant's uncle and that Virgil Winkles had lived with him during part of 1972. Dobbins further testified that he had known Eva Sims and had seen her with appellant at his (Dobbins') mobile home approximately five times in 1972. Dobbins stated that appellant had a key to his mobile home and that he never remained inside when appellant and Ms. Sims were there. Dobbins related that he had seen appellant and Ms. Sims on the road driving toward his mobile home "about seven or eight times." *Page 895 
Billy Ray Kelley recalled that, on one occasion during the time appellant was accused of raping Danny Sims' wife, Eva, he saw "Danny and Lloyd at the VFW Club in Guntersville." Outside the jury's presence Kelley related that Danny Sims had informed appellant at the VFW Club that "he knowed he didn't rape her, but said there was nothing he could do about it." Again, the State's objection to this conversation being revealed to the jury was sustained.
Kenneth Pierce testified that he had known Eva Sims in 1977 at the time she claimed she had been raped by appellant. Outside the presence of the jury, Pierce admitted that he had been to Eva Sims' house to see her "socially" approximately four times. Pierce stated that he had taken Ms. Sims to lunch at Holly Pond on the day she was allegedly raped by appellant. Pierce testified that appellant "came to my house about twelve or one o'clock" on the day following the alleged rape. The trial court sustained the State's objection to Pierce's testimony being presented to the jury.
Following the admission of certain exhibits, the defense rested its case. After hearing lengthy closing arguments by both sides and the trial court's oral charge, the jury returned the two guilty verdicts.
Appellant's first contention of error is that his appointed counsel had conflicts of interest which prevented them from adequately representing him. At the arraignment proceedings which commenced on May 13, 1980, it was ascertained that appellant did not have retained counsel and did not have the means to employ counsel. The trial court, accordingly, appointed the Honorable T.J. Carnes and the Honorable William C. Gullahorn to represent appellant. Mr. Carnes and Mr. Gullahorn are both experienced trial lawyers, having between them almost fifty years in the active practice of law. The trial court made it clear that its selection of Mr. Carnes and Mr. Gullahorn was because "the Court wants the defendant to have the very best counsel available."
The circumstances of the possible conflicts of interest were fully discussed at the May 13, 1980, proceedings. Mr. Carnes informed the trial court that his son and law partner, the Honorable Jimmy Carnes, was actively representing the deceased Eva Sims as her personal attorney in several matters involving appellant at the time of her death. Mr. Gullahorn also informed the trial court that he had represented the district attorney in a domestic relations case and that additional litigation in the matter was probable. Appellant was present in the courtroom when these conflicts were made known. When questioned individually by the trial court, both Mr. Carnes and Mr. Gullahorn responded that the conflicts of interest which had been revealed would not affect them personally in representing appellant.
After reference was made to the "Fifth Circuit case,"[2] the trial court directed Mr. Carnes and Mr. Gullahorn to discuss the conflicts with appellant "to see if it's feasible for you to continue in the case." The trial court carefully explained to appellant that, after he was informed of the potential conflicts, it would be his decision, and his alone, whether he wanted to waive the conflicts and be represented by Mr. Carnes and Mr. Gullahorn, or have different counsel appointed.
 "Mr. Duncan . . ., as you know, you'll be on trial for your life, and the Court has tried to select for you the best counsel it could find. It's up to you, though, whether you want to accept those counsel. If they have conflicts that you cannot waive . . . that you cannot waive, then you let the Court know and the Court will replace that counsel if there's any merit to the conflict in question, but you discuss it with them and, if there is any . . . any conflict there that you cannot waive, that you feel would in some form or manner prejudice you in any way, you let the *Page 896 
Court know, through your attorneys or through yourself, and we'll proceed in the case. Please retire with your attorneys and discuss the matters in each of the cases, and make sure you fully understand your rights. . . ."
Both Mr. Carnes and Mr. Gullahorn later reported to the trial court that they had fully disclosed the conflicts of interest to appellant. The trial court took the additional step of calling the Honorable Marion F. Lusk, the senior member of the Marshall County Bar Association, to confer with appellant and offer him independent advice on the appointment of Mr. Carnes and Mr. Gullahorn.
After appellant had been advised of the conflicts of interest and had been independently advised by Mr. Lusk concerning the conflicts, appellant informed the trial court, "I'd just as soon have these two attorneys as any of 'em."
 "THE COURT: All right, sir. And you waive any conflict or possible conflict they have?
"DEFENDANT: Yes, sir.
. . . .
 "THE COURT: . . . Mr. Duncan, you heard the matters that were raised yesterday by the two attorneys, and I understand . . . I want to make sure. You agree that the two attorneys are acceptable to you?
"DEFENDANT: Yes, sir.
 "THE COURT: And that you do that, knowing of the conflicts that they stated here in open court yesterday and to you privately about the matter?
"DEFENDANT: Yes, sir.
 "THE COURT: And do you waive any question about the appointment of the attorneys?
"DEFENDANT: Yes, sir.
 "THE COURT: And if there is any conflict you waive those?
"DEFENDANT: Yes, sir."
The arraignment proceedings were concluded on February 3, 1981, after several hearings in the interim from May 13, 1980. Even though Mr. Carnes and Mr. Gullahorn had actively represented appellant for almost nine months, the issue concerning the conflicts of interest in their adequately representing him was raised again at the February 3 hearing.
The trial court appointed the Honorable W.D. Wilkes, Jr., a practicing attorney with twenty-five years' experience, to confer with appellant once again regarding the appointment of Mr. Carnes and Mr. Gullahorn. Before conferring with appellant Mr. Wilkes responded affirmatively that he understood the issues that had been presented to the court.
Following his conference with appellant Mr. Wilkes reported that, in his opinion, appellant was well represented:
 "He (appellant) knows of no attorneys that he would rather have or could do him a better job. The defendant is, of course, concerned and reluctant to make a complete evaluation of the two attorneys or any attorneys that he might have at this time until after trial. I see . . . I see nothing really in conflict between the defendant and his two attorneys, between those people. . . ."
Although Mr. Wilkes stated that he did not discuss with appellant waiving any error concerning the appointment of Mr. Carnes and Mr. Gullahorn, Mr. Wilkes related that appellant did not object to either of the attorneys representing him.
 "THE COURT: Does he claim that from what he has heard that he has any reason to believe that either of these attorneys would refrain from doing anything that they should do in this case?
 "MR. WILKES: I got nothing of that from our conversation.
 "THE COURT: And he makes no objection to the appointment of these counsel?
"MR. WILKES: No, sir, not to me.
 "THE COURT: Do you make any objection to the appointment of these counsel?
"DEFENDANT: No, sir, not at this time.
. . . .
 "THE COURT: Well, of course, the Court appointed Mr. Wilkes to . . . for the defendant, if he had any objection to *Page 897 
the appointment of these counsel, because of the matters mentioned . . .
"MR. WILKES: He doesn't.
 "THE COURT: Because of the matters mentioned. He has no objection on those grounds is what I'm asking?
"MR. WILKES: No, sir.
. . . .
 "THE COURT: Mr. Duncan, do you have any objection to the appointment of these attorneys in your case because of the fact that Mr. Gullahorn has a personal relationship with Mr. Starnes and has represented him with reference to some domestic difficulties?
"DEFENDANT: No, sir, not at this time.
 "THE COURT: All right, sir. Do you have any objection to the appointment of Mr. Carnes?
"DEFENDANT: No, sir. Not at this time.
 "THE COURT: . . . because of the fact that at one time his law partner had a business relationship with Eva Sims?
 "DEFENDANT: Well, if it was a business relationship, I have no objections."
Following this exchange the trial court reaffirmed its appointment of Mr. Carnes and Mr. Gullahorn to represent appellant.
There can be no question that both Mr. Carnes and Mr. Gullahorn had actual conflicts of interest, which, without a waiver by appellant, would have prevented constitutionally adequate representation[3]. The question which we must resolve is whether or not appellant knowingly and intelligently waived his right to have conflict-free assistance of counsel.
It must initially be noted that a defendant may waive his Sixth Amendment guarantee to conflict-free assistance of counsel. Even though the right to competent counsel is "fundamental," it may nonetheless be waived. United States v.Garcia, 517 F.2d 272 (5th Cir. 1975). A waiver is valid, however, only if it is knowingly and intelligently made. Zuckv. Alabama, 588 F.2d 436, 440 (5th Cir.), cert. denied,444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). Quoting fromGarcia, supra:
 "Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the classic case delineating the standard for measuring an effective waiver of a constitutional right, requires that a waiver must be an `intentional relinquishment or abandonment of a known right.' This standard must be applied in all cases in which the underlying claim is a federal constitutional right. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). The Supreme Court refined the Johnson standard in Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747, 756 (1979) by requiring that valid waivers not only be voluntary but also be `knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" 517 F.2d, at 276.
The court in Zuck, supra, listed the following steps which must be taken in order *Page 898 
for a defendant's waiver of conflict-free counsel to be considered knowing and intelligent: "the State must show that the defendant (1) was aware that a conflict of interest existed; (2) realized the consequences to his defense that continuing with counsel under the onus of a conflict could have; and (3) was aware of his right to obtain other counsel." 588 F.2d, at 440.
The record before us demonstrates convincingly that the above standard was satisfied. The facts on their face show that appellant made an express waiver of conflict-free counsel. And because the guidelines described in Zuck were followed, it is equally apparent that his waiver was made knowingly and intelligently.
Appellant argues, however, that the second step in the Zuck
guidelines was not established. We disagree. Appellant was advised in court and privately concerning the details of the conflicts by Mr. Carnes and Mr. Gullahorn. He was separately advised concerning the conflicts by independent counsel, Mr. Lusk and Mr. Wilkes. The private conferences between appellant and the attorneys to discuss the conflicts of interest were held at the direction of the trial court. The trial court, as well as the appointed attorneys, was mindful of the Zuck
decision and attempted to take every precaution to insure comportment with its requirements. Additionally, the trial judge personally explained the conflicts of interest to appellant and ascertained that he understood the information given him by the attorneys.
From a definitional standpoint, in order to show that a defendant "realized the consequences to his defense that continuing with counsel under the onus of a conflict could have," it is only necessary that he understand "the potential perils of such a conflict" and "that he has discussed the matter with his attorney or if he wishes with outside counsel."Garcia, supra, 517 F.2d, at 278.
As stated previously, it cannot be denied that appellant "discussed the matter" both with his appointed counsel and with outside counsel. Appellant and four attorneys talked about the conflicts. The question remains, however, did appellant understand the potential perils of the conflicts? In our opinion the answer is yes.
The conflicts of interest present in this case are not difficult to comprehend; it does not take a legal tactician to realize the "potential perils" of being represented by counsel having such conflicts. There is no contention that appellant is either unintelligent or a fool. We find it difficult to believe, therefore, that appellant, given even the bare surface information that Mr. Gullahorn had represented representing the prosecutor and that Mr. Carnes' law partner had formerly represented Ms. Sims against him, did not appreciate the consequences of continuing with his appointed counsel. And considering that two additional distinguished members of the bar with longstanding trial experience independently advised appellant concerning the matter, pursuant to directions from the trial court, it can hardly be said that appellant did not realize the consequences of continuing with Mr. Carnes and Mr. Gullahorn.
The second step outlined in Zuck does not require that a defendant be able to divine the ultimate result of defense counsel's efforts in his behalf (whether he will be acquitted or convicted) where his counsel has a conflict of interest, but only that the defendant be supplied with enough information to sufficiently understand the nature of the conflict of interest to make an informed choice whether to continue with that counsel or obtain other counsel. The conflicts were fully explained to appellant and he was given every opportunity to be represented by other counsel.
Nor does appellant strengthen his position by expressing reluctance "to make a complete evaluation of the two attorneysor any attorneys that he might have at this time until after trial." Quite naturally, after a jury returns a guilty verdict a defendant may be "greatly dissatisfied" in his evaluation of trial counsel. However, this is a far cry from a denial of the constitutional right to the effective assistance of *Page 899 
counsel. McKinnis v. State, 392 So.2d 1266, 1270 (Ala.Cr.App. 1980), cert. denied, 392 So.2d 1270 (Ala. 1981). In short, we find that appellant made a waiver and that it was knowingly and intelligently made.
It should also be mentioned that Mr. Carnes and Mr. Gullahorn acted in complete compliance with ethical standards in representing appellant despite their conflicts of interest. DR 5-105 (C) of the Code of Professional Responsibility of Alabama State Bar reads as follows:
 "In the situation covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if he reasonably determines that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."
Appellant next contends that the trial court erred to reversal in overruling his motion for a change of venue or a continuance because of five newspaper articles which appeared in the local Sand Mountain Reporter. The articles were spaced over a thirteen-month period, the last one appearing on March 28, 1981, two days before the trial began. Each article described the shooting of Ms. Sims and her two sons and appellant's conviction for raping Ms. Sims in 1977. It was reported in the first article, February 16, 1980, that Chief Deputy Lacy Galloway had heard "rumors" that appellant had "threatened the life" of Ms. Sims after the rape conviction. The other articles, which were based on the first article, related that "according to authorities, Duncan had threatened the life of Ms. Sims."
The Sand Mountain Reporter had a circulation of approximately six thousand to sixty-five hundred in Marshall County during the time in question. It was further shown that many of the sixty-five prospective jurors had access to the newspaper, nine by subscription and the rest from other sources. Several of the prospective jurors responded affirmatively that they had read something about the case in the newspaper or had heard about the case through other sources.
Appellant's motion to individually question the prospective jurors in private to ascertain what information they had gleaned from the Sand Mountain Reporter was overruled. None of the prospective jurors responded, however, that they had a fixed opinion concerning appellant's guilt or innocence which would bias or affect their verdict.
The granting of a motion for change of venue or for a continuance in a criminal case rests within the sound discretion of the trial court, the exercise of which will not be disturbed unless clearly abused. Lopez v. State,415 So.2d 1204 (Ala.Cr.App. 1982); Weaver v. State, 401 So.2d 344
(Ala.Cr.App. 1981). The standards to be applied when an application for change of venue is made are set out in Andersonv. State, 362 So.2d 1296 (Ala.Cr.App. 1978) and need not be recited here. We also find Bosarge v. State, 273 Ala. 329,139 So.2d 302 (1961), which concerns a defendant's motion for a continuance due to adverse publicity conveyed by newspaper to prospective veniremen, to be illuminating.
The fact that jurors knew of the case did not establish that, at the time of empaneling, they were biased against the defendant where they swore that their knowledge would not affect their judgment. Hale v. United States, 435 F.2d 737 (5th Cir. 1970), cert. denied, 402 U.S. 976, 91 S.Ct. 1680,29 L.Ed.2d 142 (1971). The existence of widespread publicity in and of itself does not require a change of venue. Dolvin v.State, 391 So.2d 666 (Ala.Cr.App. 1979), aff'd, 391 So.2d 677
(Ala. 1980). The burden is upon the appellant to demonstrate the actual existence of a prejudicial opinion in the mind of the jurors which will raise a presumption of partiality.Speigner v. State, 367 So.2d 590 (Ala.Cr.App.), cert. denied,367 So.2d 597 (Ala. 1979).
The appellant in the instant case presented no evidence that jurors were actually prejudiced against him as a result of the publicity. "The introduction of news *Page 900 
articles alone, without more, is not sufficient evidence to justify a change of venue; their prejudicial effect must be shown." Magwood v. State, [1982] 426 So.2d 918 (Ala.Cr.App. 1982) affirmed [1983] 426 So.2d 929 (Ala. 1983). Absent inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, there must be some showing of a connection between the publicity generated by the news articles and the existence of actual jury prejudice. Lopez, supra; Anderson, supra.
Moreover, it is within the trial court's discretion to allow individual voir dire of prospective jurors. Seals v. State,282 Ala. 586, 213 So.2d 645 (1968); Aaron v. State, 273 Ala. 337,139 So.2d 309 (1961); Edwards v. State, [Ms. 1 Div. 335, June 29, 1982] (Ala.Cr.App. 1982); Raines v. State, 429 So.2d 1104
(Ala.Cr.App. 1982) affirmed, 429 So.2d 1111 (Ala. 1982).
The trial court gave to the appellant every opportunity to propound questions to the venire as a whole regarding the effects of the news articles. We, thus, find no abuse of discretion. The trial court properly overruled appellant's motions for change of venue, continuance and individual voir dire of the jury venire.
During the voir dire of the jury venire by defense counsel seven prospective jurors initially responded that they could not make a fair and impartial judgment in the case because one of the victims was a four-year-old child and they would tend to relate that child to their child or grandchild. The seven prospective jurors were later challenged for cause by name. The following exchange then occurred:
 "THE COURT: Let me ask the jury panel a question. Ladies and gentlemen of the jury panel, some of you, in answer to a question by Mr. Gullahorn about your ability to disassociate your child or grandchild from the alleged death of the child in this case, and . . . you indicated that you couldn't give the defendant a fair trial. Now, I want to ask you to think about that very carefully, and I want to know if we have a juror who because a child was involved could not impartially try the case? Do we have any juror because of a child . . . may be involved in the case that couldn't fairly try the case as if the child were an adult?
"(Juror held up hand).
"THE COURT: All right. Mrs. Rains . . .
 "JUROR: I teach four year olds and three year olds or pre-school and I'm emotionally involved with those little children as much as I am with my own at home, and I don't . . . I'm just emotionally involved with tiny children.
 "THE COURT: Do we have anybody else who, because a child was involved, would not be able to give the defendant the same kind of a fair trial as if it were some other age person?
"(Jurors held up hands).
"THE COURT: All right, sir, and what's your name?
"JUROR: Joe Carroll.
 "THE COURT: Carroll. Anyone else? Yes, sir, and your name, sir?
"ANOTHER JURORS: Brooks. Edwin Brooks.
 "THE COURT: Brooks. Anyone else? All right, thank you. All right . . . I'm going to grant your challenge as to Brown . . . that was Rains, first . . . who were the others that answered?
 "MR. CARNES: Carroll, Brooks and Rains were the ones you just . . .
 "THE COURT: Carroll, Brooks and Rains, all right. Carroll, Brooks and Rains . . . I'll grant your challenge as to Carroll, Brooks and Rains.
 "MR. CARNES: Judge, we ask to bring the others . . . that answered previously that they could not . . . forward and further question them about their feelings.
"THE COURT: Who were they?
"MR. CARNES: Calligher, Berry, Brown and King.
 "THE COURT: I'm going to overrule as to that. I think . . . I think we've . . . *Page 901 
 "MR. GULLAHORN: We except to the court's ruling and the way the court phrased the question to the jurors, which indicated the court wanted them to, we believe, answer the question in the negative to keep from being disqualified, and we except to the court not granting this challenge.
 "THE COURT: Overruled as to that. I think you've had full benefit of that question. . . ."
We find no error in this procedure. The trial court simply asked the question to ascertain whether the jurors who initially responded affirmatively would actually be prejudiced against appellant or whether they had responded without carefully weighing their answers. We disagree that the question propounded by the trial judge "conveyed to the jury the answer he wanted and expected." The question did not suggest a desired answer but simply required the jurors to ponder the matter and not answer in an impulsive, hasty manner. We find that the "other four" prospective jurors were given the opportunity to reaffirm their initial response, which would have indicated bias, and chose not to. The question was clearly before them.
Based on law cited earlier in this opinion, the trial court did not abuse its discretion in refusing to allow appellant to further question the four jurors, individually, on this point. The three jurors who maintained their positions were successfully challenged for cause.
When a common law ground for challenge is at issue, "there must be a showing of absolute bias leaving nothing to the discretion of the trial court, or there must be a mixed question of law and fact to be determined by the trial court exercising its sound discretion." Thomas v. State,373 So.2d 1167, 1169 (Ala. 1979). Because the four jurors did not reaffirm their initial response when clearly given the opportunity to do so, it cannot be said that they were absolutely biased against appellant. Certainly, the trial court did not abuse its discretion in overruling appellant's challenges for cause as to those jurors.
Appellant next alleges that the trial court erroneously excluded the following evidence from the jury at the guilt determining phase of the trial which he claims was relevant to show his state of mind at the time of the killings: (1) the transcript of the testimony at the rape trial; (2) the testimony of Kenneth Pierce that, at the time of the alleged rape, he was seeing Ms. Sims socially and had had a date with her the day of the rape; (3) the testimony of Jimmy Sims that he had testified erroneously at the rape trial concerning when he had conversed with appellant at the VFW Club; (4) the testimony of Davidson and Kelley that they had heard Danny Sims tell appellant he knew appellant had not raped his wife. Below, appellant specifically offered only the evidence enumerated in (1) and (4) above to show his state of mind at the time of the killings; he assigned no specific reason why the evidence enumerated in (2) and (3) should be admitted. We think that the trial court's rulings, sustaining the State's objections to all of the above proferred evidence, were correct.
Appellant candidly admits in brief that he has been unable to find any authority directly on point to support his position. The cases cited by appellant in support of his argument are not determinative of the present issue. It must be stated, and stated strongly, that this appeal cannot serve as a vehicle for the re-declaration of innocence of the prior rape charge, but must concern the issues as they are relevant to this case.
As this court wrote in Hill v. State, 366 So.2d 296, 314
(Ala.Cr.App. 1978), aff'd, 366 So.2d 318 (Ala. 1979):
 "Evidence, to be competent and admissible, must be relevant. That is to say, evidence must tend to prove or disprove the issues before the jury. Slagle v. State, 39 Ala. 691, 108 So.2d 180 (1959). The determination of the relevancy or lack of relevancy of particular evidence rests largely in the sound discretion of the trial judge. Bryant v. State, 49 Ala. App. 359, 272 So.2d 286 (1972), cert. denied, 289 Ala. 740, 272 So.2d 297 (1973), *Page 902 
cert. denied, 412 U.S. 922, 93 S.Ct. 2744, 37 L.Ed.2d 149 (1974). It is, therefore, the duty of the trial judge to limit evidence to the points in issue so that the attention of the jury is not distracted, nor withdrawn from the primary issues, to be directed towards foreign matters or issues of questionable or doubtful relevancy. Jones v. State, 17 Ala. App. 394, 85 So. 930 (1920); Hoomes v. State, 34 Ala. App. 121, 37 So.2d 686 (1948)."
And in an earlier statement by the Alabama Supreme Court inJordan v. State, 81 Ala. 20, 30, 1 So. 577 (1887), we find:
 "In respect to the relevancy of evidence, the general rule is that it must be confined to the points in issue, and no circumstance is admissible which does not tend to establish a fact material to the prosecution or defense, or from which no presumption or inference can be reasonably drawn in reference to a material fact or inquiry involved in the issue."
In addition, even if evidence is relevant, it is immaterial if it does not give rise to an inference that is an ultimate issue in the case. C. Gamble, McElroy's Alabama Evidence § 21.01 (1) (3rd ed. 1977).
Viewing the facts in light of the foregoing principles of law we are of the opinion that the above evidence offered by appellant, every bit of which related directly to the rape trial itself or surrounding circumstances to the rape charge, was either irrelevant or immaterial to any ultimate issue in this case.
Undisputedly, appellant's state of mind at the time of the killings was an important question for the jury to resolve. Appellant's state of mind at the time of the killings, therefore, is an ultimate issue in this case. Appellant's state of mind the night he killed Eva and Eric Sims is important because it bears on the question of his intent or capacity to form a specific intent at the time the acts were committed. Clearly, whether the killings were intentional or not is a primary consideration in this case. So, in order for the evidence to be relevant or material to show appellant's state of mind on the night of the killings, it must throw illumination on the question of his intent at the time of the crime. If the evidence appellant desired to have admitted does not illuminate what his intent was at the time of the shootings then such evidence was properly excluded.
To see that the evidence was properly excluded it is helpful to see what would have been accomplished had it been admitted. Assuming the evidence had been admitted, the jury had viewed it in light most favorable to appellant and had concluded that he, in fact, had not earlier raped Ms. Sims, which is all speculation, what would have been proven? At most, it would have shown that an innocent man had been convicted of committing a depraved act and, consequently, had every reason to be livid with rage and resentment. However, such fact in no way would have negated his specific intent to commit the killings or justified the killings. That is the issue that must constantly be borne in mind. In other words, the fact that appellant was wrongly convicted of raping Ms. Sims, if such was the case, does not give rise to the inference that he did not, or could not, form the specific intent to kill her almost three years later, nor does it lessen his culpability for committing the act.
As appellant recognizes, the evidence he offered in regard to the rape of Eva Sims would have in no way established justification for killing her and her four-year-old son. Appellant did not offer any evidence that he was insane, nor was it suggested that he acted in self-defense at the time of the killings. While appellant argues that the evidence concerning the rape was not offered to show justification for the killings, but to show his state of mind, we find such argument to be circuitous and specious. It was never questioned that appellant committed the killings. Boiled down to its essence, the only purpose admitting the evidence regarding the rape could have served, if the jury believed appellant's version of the incident, would have been to mistakenly justify appellant's acts the night he killed Ms. Sims and her son. Just as the prison conditions at Atmore *Page 903 
Prison were not relevant, as precipitating factors, to the issue of whether or not the defendant killed Luell Barrow inJohnson v. State, 335 So.2d 663, 674 (Ala.Cr.App.) cert. denied, 335 So.2d 678 (Ala. 1976), we do not believe that the transcript of the rape trial and the other testimony regarding the circumstances of the rape were relevant to show appellant's state of mind, more particularly whether or not he had the specific intent to kill Eva Sims, on the night in issue here.
Additionally, we do not believe that the evidence proferred by appellant was relevant to show that he acted in a "heat of passion." We have been cited to no case, nor has our research revealed one, that would permit the "heat of passion" principle (which in appropriate circumstances will reduce a killing from murder to manslaughter) to be predicated on events that transpired over two and a half years earlier. See Smith v.State, 83 Ala. 26, 3 So. 511 (1887); Farr v. State, 54 Ala. App. 80, 304 So.2d 898 (1974). If there was time for his passion to cool, a defendant may be guilty of murder, though his rage actually continued, and caused him to strike the fatal blow.McNeil v. State, 102 Ala. 121, 15 So. 352, 48 Am.St.Rep. 17 (1893). Five days after the act was committed which precipitated the killing is a sufficient time for a defendant's passion to cool, Palmore v. State, 253 Ala. 183, 43 So.2d 399
(1950). Four hours may be time for sufficient cooling of passions. Ragland v. State, 125 Ala. 12, 27 So. 983 (1900). Under a legion of decisions in Alabama case law, only the provoking events which occur shortly before a killing can be considered in determining whether the exercise of one's judgment was suspended so that he acted in a sudden passion or heat of passion. See Brewer v. State, 160 Ala. 66, 49 So. 336
(1909); Smith, supra. We hold that it is proper to disallow the reception into evidence of remote events, which have been tangentially linked at best with other events that may give rise to a "heat of passion" finding, under an all encompassing shroud of relevancy theory. If the law were otherwise digressions from the ultimate issues at bar would become endless.
In short, it cannot be said that the trial court abused its discretion in finding that the evidence proferred by appellant regarding the rape was irrelevant during the guilt-determining phase of appellant's trial.
Moreover, the very information regarding the rape that appellant was desirous for the jury to know was known. It had previously been admitted through appellant's telephone conversation with his father and through his confession a short time later. While the transcript of the rape trial and other testimony associated with the rape would have bolstered appellant's self-serving remarks to his father and law enforcement officers, nonetheless, such additional evidence would have been cumulative. The trial court, again, would have been correct to disallow the evidence. If a trial court's ruling is correct for any reason it will not be reversed on appeal. Harnage v. State, 290 Ala. 142, 274 So.2d 352 (1972).
For the same reasons stated in Carpenter v. State,400 So.2d 417 (Ala.Cr.App.), cert. denied, 400 So.2d 427 (Ala. 1981), the photographs of the victims were properly admitted.
Appellant next questions the sufficiency of the State's evidence as it relates to count one in the indictment. Appellant maintains that the killing of Eva Sims was done in a sudden transport of passion which, because of the facts, would not support a capital felony conviction. He cites Easley v.State, 246 Ala. 359, 20 So.2d 519 (1945) as authority. He further contends that the legislature only intended for § 13A-5-31 (a)(4), Code of Alabama 1975 to have application in cases where the burglary was "unrelated to and not for the purpose of the killing itself." We disagree with both arguments and find that the State's evidence was sufficient to support a conviction under count one in the indictment.
As to appellant's first argument, Easley is to be distinguished from this case, both from the standpoint of the facts and the law. In essence, the defendant and his *Page 904 
wife in Easley had "argued" from three o'clock one afternoon until nine o'clock that night when they both "got in bed." 20 So.2d, at 520. At some point the defendant's wife got out of bed, retrieved "an oak stick," walked back to "her side of the bed and struck him with the stick." 20 So.2d, at 520. The defendant responded by pulling a knife from his trousers, which were hanging on the bed post, and stabbed her. He continued to stab her until she fell. The defendant also hit his wife once with an axe handle.
Determining that the weight of the evidence was insufficient to support a first degree murder verdict, the Supreme Court inEasley wrote the following:
 "After a full consideration of the evidence we are of the opinion that the great weight of the evidence goes to show that, as the result of the blow, defendant was so infuriated that he lost all sense of proportion, and became a raging beast, and that the killing was the result of passion heated blood." 20 So.2d, at 521.
The Supreme Court in Easley further pointed out that the trial court had not charged the jury on manslaughter or on the "heat of passion" principle even though "there was ample proof tending to show that defendant acted under a heat of passion." "The effect of the court's oral charge was to limit the consideration of the jury to the offense of murder in the first or second degree." 20 So.2d, at 522.
In the case at bar, appellant went to Ms. Sims' residence twice the night he killed her. On the second occasion he went armed with a rifle, ready to take action. He parked his car three hundred feet away across a field and waited outside Ms. Sims mobile home until her friend, Ron Foster, had left. Appellant also cut Ms. Sims' telephone line before attempting "to talk" to her. While there was some evidence, if believed, that appellant acted in a sudden heat of passion, there certainly was evidence that he acted in a very calculating, deliberate manner, stalking Ms. Sims until his desire for revenge was satisfied. Thus, factually, Easley is distinguishable.
Furthermore, the trial court's oral charge in this case was not limited like the one in Easley. The trial court correctly defined the various lesser degrees of homicide, including manslaughter, which the jury could consider and also adequately charged on the heat of passion principle. Decidedly, the jury had the option of finding that the appellant acted in the heat of passion, but did not. Thus, as a matter of law, Easley is also distinguishable.
Where the evidence presents questions of fact for the jury, and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion to exclude the State's evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial do not constitute error.Young v. State, 283 Ala. 676, 220 So.2d 843 (1969). "A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust." Johnson v.State, 378 So.2d 1164, 1169 (Ala.Cr.App.), cert. quashed,378 So.2d 1173 (Ala. 1979).
As to appellant's second contention, that the legislature did not intend § 13A-5-31 (a)(4), Code of Alabama 1975 to be applied except in cases where the burglary "was unrelated to and not for the purpose of the killing itself," we find no merit. In Spears v. State, 428 So.2d 174 (Ala.Cr.App. 1982) the defendant broke into his ex-wife's home, shot and killed his ex-wife and seriously wounded a man who was there. AlthoughSpears concerns the validity of a guilty plea, the indictment and the facts in that case are substantially similar to the indictment and facts before us. Spears' conviction for violating the capital felony enumerated at § 13A-5-31 (a)(4) was affirmed by this Court. There is no hint anywhere in Spears
that the defendant *Page 905 
broke into and entered his ex-wife's house for any other purpose than to kill her.
The limitation in the application of § 13A-5-31 (a)(4), Code of Alabama 1975 suggested by appellant is not apparent from the plain reading of the statute nor is it supported by case authority on point. We, therefore, hold that § 13A-5-31 (a)(4) was applied properly in this case, just as it was in Spears, and that every element necessary to sustain a conviction under count one in the indictment was clearly proven.
Having determined that the evidence was sufficient to support appellant's conviction for the offense charged in count one of the indictment, we hold that his separate conviction and sentence under count two cannot be allowed to stand. To hold otherwise would allow appellant to be punished twice for killing the same person, Eva Sims.
The gravamen of the capital offense set out at § 13A-5-31 (a)(10), Code of Alabama 1975, as well as the thirteen other capital offenses found in § 13A-5-31 (a) is the "intentional killing." "Without an `intentional killing' there could be no death penalty." Kyzer v. State, 399 So.2d 330, 335 (Ala. 1981);Owen v. State, 418 So.2d 214, 216 (Ala.Cr.App. 1982). As the Supreme Court of Alabama stated in Beck v. State,396 So.2d 645, 661-662 (Ala. 1981):
 "Without question, the legislature has spelled out specifically what offenses it considers to be capital offenses. The Alabama legislature has substantially followed the Model Penal Code in describing with specificity those offenses which are deemed capital offenses. Code 1975, Section 13A-5-31. Each of the fourteen crimes specified requires an intentional killing with aggravation, and not some crime other than homicide under aggravated circumstances."
With this principle in mind, it becomes apparent that for a conviction to be sustained under count two of the present indictment it would be necessary to prove, as a material element, that Eva Sims was intentionally killed. In other words, the intentional killing of Eva Sims was an absolutely essential element for the capital offense enumerated at Section 13A-5-31 (a)(10) to have been proved. And yet that very element was essential and was proved under count one of the indictment which charged violation of the capital offense enumerated at Section 13A-5-31 (a)(4).
Section 15-3-8, Code of Alabama 1975, in pertinent part, reads as follows: "Any act or omission declared criminal and punishable in different ways by different provisions of lawshall be punished only under one of such provisions. . . ."
(Emphasis added.) We find the following language in Wildman v.State, 42 Ala. App. 357, 165 So.2d 396 (1963), cert. denied,276 Ala. 708, 165 So.2d 403 (1964) illuminating and applicable to the present situation:
 "It is also not open to dispute that if there were merely a single inseparable act violative of more than one statute, or if there were an act which itself violated one statute and was a material element of the violation of another, there would have to be single punishment." Emphasis added.
The "single inseparable act" in this case is the intentional killing of Eva Sims. Appellant was convicted and punished for committing this act under count one of the indictment. This "single inseparable act" which is violative of Section 13A-5-31 (a)(4) is also "a material element" of the violation of another statute, Section 13A-5-31 (a)(10).
We hold that appellant cannot be punished twice for the intentional killing of Eva Sims. To allow his conviction and sentence under count two of the indictment to stand would force this result. Appellant's motion at the close of the State's case "to require the State to elect as to which of the charges of the homicide of Eva Sims it will prosecute" should have been granted. See Deason v. State, 363 So.2d 1001 (Ala. 1978); Jonesv. State, 373 So.2d 1221 (Ala.Cr.App.), cert. denied,373 So.2d 1225 (Ala. 1979).
Having determined that appellant's conviction and punishment under count two of the indictment was error for the reasons discussed above, we need not decide whether *Page 906 
the doctrine of transferred intent would be applicable to bring the killing of Eric Sims within the ambit of the capital felony described in Section 13A-5-31 (a)(10). In no event, however, would the felony-murder doctrine be applicable to supply evidence of intent. Ala. Code § 13A-5-31 (b) (1975). Lest we be misunderstood, our holding on this issue in no way absolves appellant of criminal liability for killing Eric Sims; such liability simply cannot be based on a violation of Section 13A-5-31 (a)(10).
Appellant's allegations of error that the trial court improperly expressed "non-verbal communications" to the jury during the oral charge and then read the requested written charges at too rapid a rate have not been preserved for our review. These allegations were raised for the first time in appellant's motion for new trial. Thus, even if the manner in which the trial court delivered its oral charge and the subsequent requested charge was error, which we do not hold that it was, appellant's objections came too late. Gurley v.State, 216 Ala. 342, 113 So. 391 (1927); Hewitt v. State,389 So.2d 157 (Ala.Cr.App. 1980).
The appellant's final contention of error is that the trial court's oral charge, when considered in its entirety, was too complex and confusing to be understood by the jury. Appellant contends that it was particularly confusing for the trial court to have charged on the lesser included offenses of murder, under count one of the indictment, as that crime is set out at § 13A-6-2 of the new Criminal Code and then to have charged on murder in the first and second degrees, under count two of the indictment, as those crimes are set out at § 13-1-70 of the old Criminal Code. Appellant further claims that it was error to instruct the jury at all on the offenses of murder in the first and second degrees because at the time the crime was committed those offenses no longer existed under the laws of Alabama. These exceptions were raised at the conclusion of the court's oral charge.
Without question, the trial court's oral charge in this case is complex; including the requested written charges and certain additional instructions which were given it covers almost forty pages in the record. At the outset of the oral charge the trial court informed the jury that "the law in this case is quite complex. It is easily the most complex criminal case that I have ever been associated with . . . [T]here are considerable complexities in the charge I'm about to give you, and, so, I want to warn you of that before we start." To say that the charge was complex, however, is not to say that it could not be understood. We are impressed with the care which the trial court took to distinguish the capital offense alleged in count one of the indictment, the elements of that offense and the lesser-included offenses pertaining to that crime from the capital offense alleged in count two, the elements of that offense and the lesser-included offenses pertaining to that crime.
Appellant's exception "to the charge in toto" was insufficient to preserve error. Where the charge given in a criminal case involves several distinct instructions or propositions, a general exception to the entire charge is unavailable, if any one of such instructions or propositions is correct. Ragsdale v. State, 134 Ala. 24, 32 So. 674 (1902);Johnson v. State, 3 Ala. App. 98, 57 So. 389 (1912). An exception reserved to the whole of a portion of the court's oral charge cannot be sustained where the portion excepted to contained as a separate proposition a correct statement of the law applicable. Kirk v. State, 10 Ala. App. 216, 65 So. 195
(1914). Moreover, an exception to a trial court's oral charge to a jury should set out the objectionable portion and not merely refer to a charge on a particular subject. Crumpton v.State, 402 So.2d 1081 (Ala.Cr.App.), cert. denied,402 So.2d 1088 (Ala. 1981).
Furthermore, we do not find that it was error for the trial court to charge the jury on first and second degree murder as being lesser included offenses of Section 13A-5-31 (a)(10) even though the crime in this case occurred after the effective date of § 13A-6-2, Code of Alabama 1975. If there was any error in this regard, we hold *Page 907 
that it was harmless. It should be noted that this anomaly has been eliminated with the adoption of § 13A-5-40 (a)(10), Code of Alabama 1975 which became effective on July 1, 1981.
We have carefully reviewed every issue raised by appellant on this appeal. For the reasons stated above, it is our opinion that the trial court's judgment of conviction and sentence under count one of the indictment is due to be affirmed, but its judgment of conviction and sentence under count two must be reversed and rendered.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
DeCARLO, P.J., and TYSON and BOWEN, JJ., concur.
[1] Foster had been introduced to Ms. Sims through her sister, Evelyn, whom he had dated while he was married. Although divorced, Foster was living with his ex-wife at the time he was "visiting" Ms. Sims.
[2] Zuck v. Alabama, 588 F.2d 436 (5th Cir.), cert. denied,444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979).
[3] Mr. Gullahorn's conflict of interest was the same as that described in Zuck v. Alabama, 588 F.2d 436 (5th Cir.), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). Mr. Carnes' conflict of interest, as previously explained, was his law partner's representation of the deceased Eva Sims in matters involving appellant at the time of her death. DR 5-105 (A) of the Code of Professional Responsibility of the Alabama State Bar reads, in pertinent part:
 "A lawyer shall decline proferred employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proferred employment, or if it would be likely to involve him in representing different interests. . . ." Emphasis added.
See Pinkerton v. State, 395 So.2d 1080 (Ala.Cr.App. 1980), cert. denied, 395 So.2d 1090 (Ala. 1981) and authority cited therein. Also see Annot., 27 A.L.R.3d 1431 (1969) for related authority that where a conflict of interest results from counsel's representation of a defendant and his representation or former representation of a prosecution witness, this fact constitutes a denial of the defendant's right to effective assistance of counsel.
DR 5-105 (D) of the Code of Professional Responsibility makes it clear that DR 5-105 (A) equally applies to a lawyer's "partner or associate of his or his firm." See Jacques v.State, 409 So.2d 876, 881 (Ala.Cr.App. 1981), aff'd,409 So.2d 885 (Ala. 1982). Also see Annot., 52 A.L.R.2d 1243, 1249 (1957).
 *Page 1