In November, 1974, the grand jury of Madison County indicted the appellant for first degree murder and charged him with killing Charles Burgess by stabbing him with a knife.
On March 3, 1975, the appellant was arraigned and pled not guilty and not guilty by reason of insanity. The jury was empaneled and on March 4th after hearing the evidence they found the defendant guilty of murder in the first degree and fixed his punishment at life imprisonment. The appellant gave notice of appeal and after his motion for a new trial was denied, he filed a motion for a free transcript and appointed counsel.
The facts surrounding this stabbing occurred on Saturday, October 13, 1974, at Charles and Martha Burgess' apartment which was located in a housing project on Binford Court in Huntsville, Alabama. Doris Taylor was Charles Burgess' cousin and on the evening of the day before the incident, she and her three children came to the Burgess' apartment for a weekend visit. That night she asked the appellant, Baker, whom she had been dating, to take her to her home in Decatur ". . . to pick up a few things." The appellant told her he could not take her that night because he could not get "transportation." On the following day, Saturday, October 13th, appellant made four visits to the Burgess' apartment. *Page 529 
He was drinking at the time and during these visits there were discussions concerning the trip to Decatur.
Doris Taylor testified that before the appellant returned the fourth time, Charles Burgess had come home from work. She was playing cards on the dining room table with Charles and Martha Burgess when the appellant entered the room. The appellant said he wanted to take her to Decatur and when she said that she had changed her mind, he asked her to come outside. When she told the appellant she was not going outside he drew his hand back to hit her and Charles Burgess stepped between them. According to Taylor, Burgess told the appellant, "he wasn't going to fight in his house" and at that point, appellant hit Burgess. He was holding Burgess with one hand and hitting him with the other. Burgess was knocked to the sofa and appellant was trying to choke him when Martha Burgess came from the bedroom. Taylor stated that Martha Burgess told the appellant to leave her husband alone but appellant continued hitting him. Burgess was wrestling with Baker and trying to get up from the couch. He did not have a chance to hit appellant and subsequently fell from the sofa onto the floor. The children then came into the room about that time and when Taylor looked, Burgess was on his back on the floor. According to Taylor, the appellant was standing over Burgess and while holding him down with one hand, he picked up the knife from the coffee table. Taylor did not know how many times the appellant stabbed Burgess but after he stabbed him the first time, she ran out the door. She recalled that Martha Burgess was standing nearby and was asking the appellant to leave her husband alone. Taylor did not see Martha Burgess touch the appellant. However, she admitted running out the door when the children jumped on appellant's back.
During cross-examination, Taylor said she did not see anything in the deceased's hands and did not see him with his hands in his pockets.
Martha Mae Burgess was the wife of the deceased and the appellant was her first cousin. She stated that the defendant came to their house to eat almost every day at the invitation of both her and her husband. Further, she said that Doris Jean Taylor had been staying with them and that she was her husband's cousin.
Mrs. Burgess testified that on October 12, 1974, her husband came home from work about 4:00 P.M. and that she, Taylor, and the children were playing cards at the time. She also testified that appellant came to the house about 2:30 P.M., but left and came back in about fifteen minutes. At that time the appellant told Taylor to get ready to go to Decatur and Taylor said, "okay." Baker then left again and it was during this period that her husband came into the house. When the appellant returned he and Taylor had a quarrel and Mr. Burgess told them to go outside and not to fight in the house. Baker, at that point, went outside but in about twenty minutes returned and came to the back door. Appellant and Taylor then had another argument and he demanded that she come outside. After Taylor refused, Mrs. Burgess heard a slap. She was in her bedroom at the time and when she stepped back into the room she saw her husband getting out of the chair and heard him say: "Man, I asked you not fight in my house." Appellant then turned and said, "nigger, that's enough." At that point, appellant hit Mr. Burgess and knocked him against the kitchen table. The deceased was trying to get off the table when appellant pulled him up and they fell back towards the couch. They then wrestled over the television and down on the floor. When they were on the floor, Mr. Burgess said, "man, forget it, let me up." The appellant responded: "I'll forget it alright . . . I'll forget it you nigger because I'll kill you." Mr. Burgess again asked the appellant to let him up and the appellant said: "I'll let you up when I kill your M . . . f . . . ass." The appellant then reached for a knife on the table and Mrs. Burgess ran over and grabbed his arms. Mrs. Burgess pleaded with the appellant not "to do it," and appellant said: "I'm *Page 530 
going to kill him, turn me loose. I'm going to kill the M . . . f. . . . . . turn me loose." Mr. Burgess then said: "Baby, turn him loose or he'll hurt you." When she turned the appellant loose he stabbed her husband.
During cross-examination, Mrs. Burgess said that after the appellant stabbed her husband she saw him hit him in the jaw and then go out the back door. She said that he then came back and started beating her husband. Further, Mrs. Burgess recalled he left a second time and then returned and kicked her husband.
Mrs. Burgess said her husband was about five feet tall and weighed about 165 pounds and described him as a "short dumpy man."
Connie Hill was Mrs. Burgess' ten-year-old son by a former marriage. On the day in question he saw his father lying on the floor with the appellant hitting him. Connie said, that when the appellant took a knife from the coffee table, his mother grabbed appellant's hand. He testified they wrestled for a short time while the appellant was sitting on his step-father. According to the witness he grabbed the appellant and was thrown back. Further, Connie said that after the stabbing, appellant continued to hit his father.
LeVon Hill was Mrs. Burgess' eight-year-old son by a former marriage and he recalled that at the time of the stabbing he was outside playing. When he heard the "curtain fall" he went into the living room and saw the appellant sitting on top of his step-father. LeVon said that appellant hit and stabbed his father.
During cross-examination, he said that at the time of the stabbing his step-father and the appellant were "sort of rolling around and fighting on the floor."
Rickey Martin, a police officer, recalled investigating a stabbing at Binford Court on October 12, 1974. It was approximately 4:25 P.M. when he arrived and saw Mr. Burgess, the deceased, lying on the ground behind the apartment. The victim was lying face-down and when Martin turned him over he noticed a stab wound in the chest. Later that evening Martin saw the appellant and heard Detective Curlee inform him of his constitutional rights.
During cross-examination, Martin stated that after a conversation with Detective Curlee, he went to Jim Parker's apartment at Binford Court and found the murder weapon on the bookcase behind a Bible.
Ron Curlee was with the homicide division of the Huntsville Police Department on October 12, 1974. On that day he investigated a stabbing at Binford Court and it was during that investigation that he talked to the appellant. He stated that after the appellant was arrested he was informed of his constitutional rights.
On cross-examination Curlee said that he asked where the murder weapon was and the appellant told him that it was in "Mr. Parker's house." Curlee conveyed this message to another officer and after the knife was turned over to him, he gave it to Van Pruitt.
Van Pruitt was employed by the State of Alabama in the Department of Toxicology and Criminal Investigation. On October 15, 1974, Detective Curlee submitted a knife to his office. On the same day, he performed a post mortem examination of the body of Charles Burgess, the victim. Pruitt observed one stab wound in the chest which penetrated the heart to a depth of one-half inch. It was his opinion the stab wound was the cause of death.
During cross-examination, Pruitt said he did not run a blood-alcohol test on the deceased and did not examine the knife for finger prints.
After recalling Officer Curlee and Martin to establish the occasion for finding the murder weapon, the State rested its case. At that time the appellant withdrew his plea of not guilty by reason of insanity and made a motion to exclude the State's evidence.
Counsel argued that the testimony showed a void in the time between the alleged fight and time of death. He alleged there had been no evidence that some intervening cause, as other physical infirmities, *Page 531 
had not been the cause of death. The motion was overruled and the appellant subsequently took the stand in his own behalf.
Baker recalled the day of the incident and said that he had gone to the Burgess' apartment in response to a request from Doris Taylor. He talked with Taylor and she wanted him to take her to Decatur. Baker told her he had to get a car and subsequently borrowed one from Billy Jones. As they prepared to leave, Jones informed him that the car did not have any insurance and that he could not let him have it. Taylor then returned to the Burgess' apartment and Baker subsequently persuaded Joe Cochran to drive her to Decatur. Baker then went over to the Burgess' apartment and was standing by the back door talking to Taylor when she told him she was not ready to leave. He said that he and Taylor quarreled after he entered the apartment and that Charles Burgess who was seated in a chair, got up and reached for a knife on the table. When Burgess started for the table, Baker grabbed him. According to appellant, they wrestled to a point in the living room where Charles Burgess fell to the floor on his back holding the knife. Appellant said that Martha Burgess then grabbed his hair and started pulling it. The appellant maintained that it was during this tussling that he was pushed on top of the victim. He stated that when he fell, the weight of his body caused the knife to go into Burgess. Baker testified that he then took possession of the knife and when he started out the front door, Charles Burgess was standing.
 I
The only contention raised by the appellant concerns the closing arguments of the prosecution. Counsel argues that the cumulative effect of the prosecutor's comments to which objections were interposed created an atmosphere of bias which no comments or rulings by the court could eradicate. The record in this appeal discloses the following excerpts from the closing argument of the defense counsel, Mr. Shipman, and those of the prosecutors, Mr. Miller and Mr. Simpson. The entire list of objections made during closing argument is as follows:
"MR. SHIPMAN: Defendant rests, your Honor.
"THE COURT: State your case to the jury.
 "(Whereupon, Mr. Miller addressed the jury with closing remarks, during which the following occurred:
 "MR. SHIPMAN: We object to the statement that they have a duty to safeguard other colored persons lives in Binford Court. [sic]
"THE COURT: Sustained.
 "(Whereupon, Mr. Miller further addressed the jury with closing remarks, following which Mr. Shipman addressed the jury with closing remarks, during which the following occurred:)
 "MR. SIMPSON: If it please the Court we object to the statement by counsel whether the witness had prior husbands and whether her children were legimate [sic] or illegimate, [sic], that is irrelevant and ask Defense Counsel not to make such remarks to that in the Court.
"THE COURT: Overruled.
 "(Whereupon Mr. Shipman further addressed the jury with closing remarks, during which the following occurred:)
 "MR. SIMPSON: May it please the Court that is not a statement consistent with this matter, the testimony was that there were two distinct charges.
"THE COURT: Overruled.
 "(Whereupon Mr. Shipman further addressed the jury with closing remarks, following which Mr. Simpson addressed the jury with closing remarks, during which the following occurred:)
 "MR. SHIPMAN: We object to that line of questioning for the District Attorney to say that I told a lie, I object to that, I never said he coached the children.
 "THE COURT: Well just comment on the testimony of the witnesses.
 "(Whereupon, Mr. Simpson further addressed the jury in closing remarks during which the following occurred:) *Page 532 
 "MR. SHIPMAN: We object to that, he handed me something else, I never got those statements, let the record show I never got those statements.
"THE COURT: Overruled.
 "(Whereupon, Mr. Simpson further addressed the jury with closing remarks, during which the following occurred:)
 "MR. SHIPMAN: We object to what the District Attorney would personally like to see in this case.
"THE COURT: Sustained.
 "(Whereupon, Mr. Simpson further addressed the jury, following which the following occurred:)
 "MR. SHIPMAN: We object again to what something would demand.
"THE COURT: Overruled.
 "(Whereupon, Mr. Simpson further addressed the jury with closing remarks, following which the following occurred:)
 "MR. SHIPMAN: We object again to what society might demand, that he stay in jail until the sun doesn't rise, until the sea stops running, etc., whatever else he said, we object to that.
"THE COURT: Sustained.
 "(Whereupon, Mr. Simpson further addressed the jury with closing remarks, during which the following occurred.)
 "MR. SHIPMAN: Your Honor we object to commenting on the electric chair, it's not in issue here.
"THE COURT: Sustained.
 "(Whereupon Mr. Simpson further addressed the jury with closing remarks during which the following occurred:)
 "MR. SHIPMAN: We object about the jury coming back again and being personally involved with the Defendant.
"THE COURT: Sustained.
 "(Whereupon, Mr. Simpson further addressed the jury with closing remarks, following which the following occurred:)
 "THE COURT: Ladies and gentlemen of the jury, let's take a recess for five minutes. Be back in here in five minutes.
 "(Whereupon, a brief recess was taken following which the following occurred:)
"COURT'S ORAL CHARGE"
Alleged prejudicial remarks by the prosecution during argument must be evaluated and determined on the merits of the individual case. Racine v. State, 290 Ala. 225, 275 So.2d 655. Further, our courts have recognized that a necessity exists for allowing the trial judge wide discretion in regulating the argument of counsel. Bullard v. State, 40 Ala. App. 641,120 So.2d 580.
After reviewing the arguments condemned by counsel as error, we are of the opinion that the cumulative effect of the comments did not create an atmosphere of bias.
We have noted that the judge before proceeding with the trial, admonished the jury not to consider as evidence anything said by the attorneys or the court. Further, at the request of the defendant, the judge gave the following written requested charge:
 "The court charges you, the jury, that you are not to consider any statement made by the District Attorney, either in opening statement nor [sic] in closing argument, as being evidence against the Defendant."
In view of the foregoing, we believe that the precautionary measures taken by the learned judge, would have eradicated any prejudice if any existed.
As can be seen from the summary of the statements objected to in the argument that is detailed above, only three rulings were adverse to this defendant.
The first instance was as follows:
 "MR. SHIPMAN: We object to that line of questioning for the District Attorney to say that I told a lie, I object to that I never said he coaxed the children.
 "THE COURT: Well just comment on the testimony of the witnesses."
In our judgment, this seems to be an expression of opinion by the prosecuting attorney and was induced by some remark made by the defense attorney during his *Page 533 
closing argument. See: York v. State, 34 Ala. App. 188,39 So.2d 694; and Knight v. State, 50 Ala. App. 39, 276 So.2d 624. In light of the court's instruction that the argument of counsel should not be taken as evidence, we do not believe this was an improper comment. See: George v. State, 54 Ala. App. 90,304 So.2d 908.
The second instance was:
 "We object to that, he handed me something else, I never got those statements, let the record show that I never got those statements."
It is apparent that this was a reply to some remark that the district attorney made and without being informed what the argument was, we can not pass on the objection. Lee v. State,50 Ala. App. 713, 282 So.2d 333.
The last instance involving an adverse ruling to this defendant was in response to the objection:
"We object again to what something would demand."
This could have been interposed to an admonition by the district attorney calling for law enforcement. However, since we are not informed of what the argument was, we can not pass on the objection. See: Canady v. State, 55 Ala. App. 473,316 So.2d 720; and Lee v. State, supra.
 II
We have reviewed the evidence in this case, a substantial portion of which is detailed above, and it is our opinion that it presented questions of fact for the jury. Further, such evidence was sufficient to sustain the conviction and the denial of the motion to exclude the State's evidence, and the overruling of the motion for a new trial did not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843.
We have searched the record and did not find any error.
AFFIRMED.
All the Judges concur.