TYSON, Judge.
Norman Agee, Jr. was indicted for the unlawful sale of cocaine in violation of § 20-2-70, Code of Alabama 1975. The jury found Agee “guilty as charged in the indictment.” Following a sentencing hearing the trial judge set punishment at five years’ imprisonment, ordering Agee to serve one year and one day in the penitentiary with the remainder of his sentence to be served on probation.
Leonard Martin testified that he is employed part time as a longshoreman on the New Orleans, Louisiana riverfront. However, for the past 13 years he has also been employed as a paid confidential informant for the Drug Enforcement Administration, United States Government. In the latter part of March, 1984, Martin was contacted by Cliff Brown of the Drug Enforcement Administration and he began working with the Mobile, Alabama Police Department shortly thereafter. During the time he was working with the Mobile police, some thirty arrests were made pursuant to his activity.
On April 19, 1984, Martin was in the vicinity of Virginia Street in Mobile, looking for a subject by the name of “nigger George”. (R. 11). Martin saw this appellant sitting on a porch. He approached the appellant and asked him if he knew “nigger George”. The appellant responded that he did know him, but that he did not know where he was at that time. Appellant then asked Martin what he was looking for, to which Martin responded that he was looking for some drugs. The appellant asked Martin what type of drugs and Martin told the appellant he was looking for a “pair”. (R. 11). Appellant told Martin that he had some “girl” (slang for cocaine) that he could have for $50 per half gram. (R. 12). Martin told the appellant that he would like to get some, but first he was looking for some “T’s and blues”, and that he would get back with the appellant. The appellant then gave Martin his home telephone number and the telephone number of a “barbecue place”. Appellant told Martin that he could meet him at a pool hall across the street from the “barbecue place”. Martin, along with Officer John Pruitt, who was present in a car at the scene, then went back to police headquarters to talk to Corporal Loftin about the conversation Martin had with the appellant.
After Martin informed Corporal Loftin and his superiors about the conversation *1069 with the appellant, they agreed to go and buy some cocaine from the appellant. The police department supplied Martin with $50 to buy the cocaine. Martin then tried to call the appellant at home, but he was not there. He then called the “barbecue place”. Appellant’s mother answered the phone and told Martin that appellant was not there but she was expecting him. Martin and Pruitt then proceeded to the “barbecue place”, but the appellant was not there. Appellant’s mother called him at home, and appellant instructed her to tell Martin to wait across the street at the pool hall. Martin and Pruitt went to the pool hall, and the appellant arrived shortly. Appellant asked Martin what he wanted and Martin told him that he wanted a half gram. Appellant told Martin to give him a few minutes, then call him at home. Approximately 20 minutes later, Martin called the appellant. At this time appellant told Martin to meet him at Delchamps at the intersection of “Government and Catherine”. (R. 17). Martin and Pruitt proceeded to this area and, upon arrival, Martin exited Pruitt’s vehicle to look for the appellant. Martin looked inside the Delchamps store and then entered Eckerd’s Drugs to look for the appellant. At this time Pruitt came into the store. Martin and Pruitt exited Eckerd’s and located the appellant in the parking lot standing beside a white station wagon. Martin approached the appellant and asked him if everything was ready. The appellant responded that it was, and Martin started to give appellant the money. Appellant stopped him, stating that they had to take a ride. Martin told the appellant he had someone with him, pointed to Pruitt, and said that Pruitt would have to go. Appellant told Martin that Pruitt could follow them and they would take care of business. Martin explained to Pruitt what was going on, then went and got in the station wagon along with the appellant and another person. They proceeded to an apartment and upon arrival, Martin gave the appellant $50. The appellant took part of the money and gave the remainder to the other person in the car. This person then got out of the car, went into the apartment, came back out a few minutes later and handed Martin a “cellophane envelope bag which is suppose to be cocaine”. (R. 20). During the time this person went into the apartment, appellant and Martin drove up the street and back. Prior to this time all of Martin’s negotiations had been with the appellant. When Martin exited the vehicle he gave the package to Pruitt.
Martin further testified that he was paid $1,000.00 for his work with the Mobile Police Department and that he had been a heroin addict at one time.
John Pruitt testified that he was employed as a police officer with the City of Mobile. On April 19, 1984, Pruitt and Leonard Martin were working undercover narcotics and had gone out to try and “make some buys”. They were traveling in Pruitt’s vehicle. Pruitt stated that he did not recall if they were looking for anyone in particular on that day. As they were driving down Virginia Street, they stopped and Martin exited the vehicle and went to talk to the appellant, Agee, who was sitting on the porch of a house. After Martin talked to the appellant some fifteen minutes, Martin returned to the car and they drove away. They proceeded to the police station and talked with Corporal Lof-tin. Upon leaving the police station, Pruitt and Martin went to the “barbecue place” where Martin asked the appellant’s mother if appellant was there. She said that appellant was not there but that she would call him at home. Some five minutes later, appellant’s mother came to the door of the “barbecue place” and talked with Martin and Pruitt. Martin then went and telephoned the appellant who told him to wait at the pool hall across the street from the “barbecue place”. Approximately 30 minutes later the appellant and another man came to the pool hall. Martin and the appellant had a conversation, after which the appellant told them to call him again. A while later Martin made a telephone call, after which Pruitt and Martin proceeded to the Delchamps store on Government Street to wait for the appellant. Martin exited Pruitt’s vehicle and went into a drug store *1070 next to Delchamps. Pruitt then saw the appellant, Agee, drive into the parking lot in a white station wagon. Pruitt then called to Martin, who went over to the appellant and talked with him. Martin then came back to Pruitt’s car, got $50, and told Pruitt to follow them. Martin then went and got in the car with the appellant and another man. They proceeded to an apartment complex where they stopped, and the man with the appellant got out of appellant’s car and entered an apartment. The appellant and Martin then drove down the street, returning in “two or three minutes”. (R. 63). The other man then came out of the apartment, got in the car with Pruitt and showed him a plastic corner of something wrapped in cellophane which had white powder in it. The appellant and Martin returned, and this man got out of Pruitt’s car and got in the appellant’s car. Martin then came back to Pruitt’s car and handed him this cellophane package.
Pruitt testified on cross-examination that he saw Martin get into the back seat of the appellant’s car. (R. 71). Martin had earlier testified that he got in the back of appellant’s car, but there were no seats, so he sat on the floor. Pruitt testified that he saw Martin hand the money to the appellant before they drove out of the parking lot at Delchamps. (R. 72).
James Loftin, Jr. testified that he was employed by the Mobile Police Department. He met Leonard Martin while working in the narcotics division. On April 19, 1984, Pruitt and Martin came into his office and told him they had a subject by the name of Agee that they were going to try and make a buy from and that it would cost $50. The next day Pruitt came in and turned in a cellophane wrapper containing a baggie end with some white powder inside. Loftin placed the evidence in the vault. Loftin further stated that Martin had made 25 or 30 cases for them and that most of the people had pled guilty.
Sylvia Bryant testified that she was employed by the Mobile Police Department Crime Lab. She identified the evidence turned in by Pruitt (as had Pruitt and Martin in their testimonies) and testified as to tests she performed on the substance. The tests established that the substance in the envelope contained slightly over .2 grams of cocaine.
Darrell Dixon testified that he was 29 years old and was serving a term in the state penitentiary for the sale of cocaine. On April 19, 1984, Dixon went by the barbecue place to get the appellant to take him to his girlfriend’s house in Toulminville, Alabama. Later that afternoon the appellant picked him up and they were proceeding to Toulminville when they stopped at Eckerd’s Drugs to get some medicine for the appellant’s father. Leonard Martin approached Dixon in the parking lot and talked with him until the appellant came out of the drug store. Martin then began talking to the appellant about having someone fix up a barbecue pit for Martin. Martin then asked Dixon if he would ride with Pruitt since there were only two seats in the appellant’s car. Dixon and Pruitt followed the appellant and Martin. Pruitt dropped Dixon off at his girlfriend’s house. Dixon went inside, then came back out and saw the appellant drop Martin off. Dixon and Martin then had a conversation, after which he took some money from Martin, went to his girlfriend’s house and came back and gave Martin half a gram of cocaine. Dixon stated that the appellant was not around when the conversation occurred.
Gotee Agee testified that she is the mother of the appellant. She stated that she owned a retail barbecue place but that she had not had a telephone in the business since 1980. She stated that prior to the day of the trial she had never seen Leonard Martin or Officer Pruitt and had never told either one of them that she was going to call her son from her business. She further stated that there were no back seats in the appellant's station wagon.
Norman Agee, Jr. testified that he was 29 years old, married and had one child. He had never been convicted of a felony on any prior occasion. Agee stated that he had talked to Leonard Martin on three oc *1071 casions prior to April 19, 1984. Martin would come to his mother’s barbecue business and buy a sandwich. They would talk about having a barbecue pit built by a man named Roy Means.
On April 19, 1984, Martin had asked Agee earlier in the day about Agee taking Martin to Roy Means’ place of business. Agee stated that he did not know how he and Martin ended up at Eckerd’s Drugs at the same time that day. Agee was taking Darrell Dixon to Toulminville when he stopped at Eckerd’s Drugs. When he came out of the store, Martin was standing next to Agee’s car talking to Dixon. Martin then began talking to him about taking Martin to see Roy Means. Agee told Martin that he had to take Dixon to Dixon’s girlfriend’s house. Martin then suggested that Agee take him to Roy Means’ place of business and that Pruitt could drop Dixon off at his girlfriend’s house. Agee agreed to this, and they proceeded as stated above. Upon arrival at Means’ place of business, Mr. Means was not there, so they started back toward town. When they approached Dixon’s girlfriend’s house, they saw Dixon standing out in the yard and Pruitt was in his car in the driveway. Agee let Martin out of the car and asked Dixon if he were going to stay there, to which Dixon replied that he was. Agee then left the area. He denied knowledge of any drug transaction or receiving any money from Martin or Pruitt. He stated that there was no back seat in his car and the floor was “rotted out”, so no one could ride there.
I
The appellant contends that the trial court erred to reversal by restricting the cross-examination of State witness Leonard Martin. Appellant argues that he was denied the right to question Martin with “respect to his motivation, bias and reason for participation in undercover narcotics work.” (Appellant’s brief, pg. 13). “Specifically, the court sustained objections to questions asked by appellant which sought to determine whether Leonard Martin had been convicted of a felony, arrested, or served time in the penitentiary.” (Appellant’s brief, page 13).
A review of the pertinent portion of the record in this cause reveals that the trial judge properly sustained the State’s objections to the questions asked by defense counsel which sought to elicit the information. From the record (R. 23-25):
“Q. How many times have you been convicted of a felony, Mr. Martin?
“MR. SHIELDS: I object to the form of that question.
“THE COURT: Sustain.
“Q. Have you ever been convicted of a felony?
“MR. SHIELDS: Object to the form of that question.
“THE COURT: Sustain.
“Q. Have you ever had any association with the police department other than as an informant?
“MR. SHIELDS: Object to that question as being irrelevant.
“THE COURT: Overrule.
“A. I don’t understand what you mean.
“Q. Have you ever had any other association with the police other than as an informant? It’s not hard.
“A. I mean in what capacity?
“Q. That’s what I want you to tell me, in what capacity?
“A. I have policemen as friends. I have dinner with them. What do you mean?
“Q. In an official capacity?
“A. Oh, yes.
“Q. What is that association?
“A. I have been arrested before.
“Q. How many times?
“MR. SHIELDS: Object. That’s irrelevant.
“THE COURT: Sustain.
“MR. IRBY: Judge, he opened the door when he said he has been arrested himself.
“THE COURT: The objection is sustained.
“Q. Have you ever been convicted of a crime?
*1072 “MR. SHIELDS: I object to the form of that question.
“THE COURT: Sustain.
“MR. IRBY: May I approach the bench.
“(Off record bench conference.)
“Q. Mr. Martin, you said you did part-time work on the riverfront?
“A. Yes, sir.
“Q. Have you ever been convicted of robbery?
“A. No.
“Q. Murder?
“A. No.
“Q. Rape?
“A. No.
“Q. Kidnap?
“A. No.
“Q. Have you ever been convicted of selling any drugs?
“A. No.
“Q. Have you ever served time in the penitentiary?
“MR. SHIELDS: I object.
“THE COURT: Sustain the objection.
“Q. Have you ever served time in the penitentiary for any crime involving moral turpitude?
“MR. SHIELDS: I object.
“THE COURT: Sustain the objection.”
“While there is no prescribed form for the question which is asked to elicit a conviction for impeachment purposes, there have been judicially declared guidelines for such a question. For example, the question must be structured in such a way as to exclude any reasonable supposition that the witness is being called upon to answer concerning his conviction for an offense which does not involve moral turpitude. In addition, the question must be specific to the point of naming the crime for the conviction of which the witness is being impeached. The question: ‘Have you ever been convicted of a crime involving moral turpitude?’ is insufficient and improper because an answer to such a question would involve the witness’ judgment as to what offenses involve moral turpitude. The question does not have to use the word conviction in order to be proper even though the cases generally speak of only convictions as being admissible for impeachment purposes ...
“In keeping with subsection (5) of this section of the text, it appears that the question must be phrased in such a way that it clearly is not eliciting a conviction for a crime under city or municipal ordinance. Therefore, it is improper to ask the witness whether he has been convicted of a named offense if that offense is a misdemeanor under state law and might also be an offense against a city or town under one of its ordinances. It is consequently, not only wise to specify the crime and that it involves moral turpitude but one should also restrict the question to a conviction under the laws of the state.”
C. Gamble, McElroy’s Alabama Evidence, § 145.01 (17) (3rd ed. 1977) (footnotes omitted). A review of the record as set out above reveals that the defense counsel did not follow the proper form in attempting to elicit the information as to a prior conviction.
Moreover, this court has spoken directly to the impropriety of many of the questions asked by defense counsel. In Nikolic v. State, 441 So.2d 997, 1001 (Ala.Crim.App.1983), the court found it improper to ask questions of a prosecution witness as to whether the witness had ever been convicted of any offense other than a minor traffic offense. In Stonoker v. State, 380 So.2d 342, 344 (Ala.Crim.App.1979), this court held that the question “Have you ever been convicted of a felony”, is insufficient and improper because, while most felonies involve moral turpitude, there are some felonies which do not.
In Anderson v. State, 53 Ala.App. 564, 566, 302 So.2d 537, cert. denied, 293 Ala. 745, 302 So.2d 540 (1974), this court held that asking the witness whether he had ever been convicted of a crime involving moral turpitude was improper as it was too general and called for a conclusion. In Headley v. State, 51 Ala.App. 148, 283 So.2d 458 (1973), this court held that to ask *1073 a witness whether he has been arrested on former occasions is not a proper inquiry. Further, in Deemer v. State, 17 Ala.App. 499, 85 So. 867 (1920), the court held that asking the witness “How many times have you been convicted of a crime?” was improper and the objection to the question was properly sustained.
It is cléar to this court that the trial court did not err in sustaining the State’s objections to questions by defense counsel. The trial court did not unduly restrict the right of the appellant to cross-examine State’s witness, Martin, by sustaining objections to improper questions. Moreover, the information which was elicited from the witness, Martin, exposed his potential bias to the jury.
II
The appellant contends that the evidence presented by the State was insufficient to support his conviction. He argues that the contradictory nature of the evidence denied him due process and thus failed to support the jury’s verdict.
“When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for acquittal, the refusal to give the affirmative charge, or the denial of a motion for new trial by the trial court, do not constitute error.” Baker v. State, 338 So.2d 528 (Ala.Crim.App.1976); Cox v. State, 363 So.2d 1054 (Ala.Crim.App.1978); Duncan v. State, 436 So.2d 883 (Ala.Crim.App.1983). Conflicting evidence as to what actually took place creates a question for the jury to resolve. Graham v. State, 339 So.2d 110, (Ala.Crim.App.), cert. denied, 339 So.2d 114 (Ala.1976); McBryar v. State, 368 So.2d 568 (Ala.Crim.App.), cert. denied, 368 So.2d 575 (Ala.1979).
“In reviewing the issue of the sufficiency of the evidence to support a conviction, this Court must accept as true the evidence presented by the State, view the evidence in the light most favorable to the prosecution, and accord the State all legitimate inferences therefrom. Johnson v. State, 378 So.2d 1164, 1169 (Ala.Cr.App.), cert. quashed, Ex parte Johnson, 378 So.2d 1173 (Ala.1979); Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App.1978), cert. denied, Ex parte Cumbo, 368 So.2d 877 (Ala.1979).” Roberts v. State, 451 So.2d 422 (Ala.Crim.App.1984). Further, “[a] verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this [cjourt that it was wrong and unjust.” Ward v. State, 356 So.2d 238 (Ala.Crim.App.), cert denied, 356 So.2d 242 (Ala.1978); Johnson, supra; Duncan, supra.
In the case at bar, the jury heard the evidence and was charged accordingly by the trial judge. We have carefully reviewed the evidence in this cause and find that there was sufficient evidence to submit the case to the jury and to support its verdict. Clearly, the preponderance of the evidence when weighed against the verdict is not so unbalanced as to convince this court that it was wrong and unjust.
The judgment of the trial court is due to be, and is, affirmed.
AFFIRMED.
All the Judges concur.