The appellant, Brian Breeding, was found guilty of the murder of Billy Gene Cobb, by strangulation, in violation of §13A-6-2, Code of Alabama (1975) and sentenced to life imprisonment.
 I
The appellant raises the issue of the sufficiency of the evidence to support his conviction for murder. The victim, Billy Cobb, was found dead in his apartment on March 4, 1986, by Mickey Woods, a maintenance person for the apartment building. He testified that he opened the victim's apartment in order to allow an exterminator to enter. Woods testified that upon entering the victim's apartment he discovered the television on and a body lying on the floor. He also testified on cross-examination that he did not detect any odor in the apartment.
Andy Jackson, the crime scene investigator for the Huntsville Police Department, testified that, in entering the victim's apartment, he observed the victim's body, lying on his back with dried blood about his face, mouth and nose. His pants were "around his buttocks and the underwear was pulled down some from his waist"; his belt was unbuckled. He also found a ligature, a gray shirt tied around his neck. The television and the light were both on and the drawers of his dresser had been pulled out and apparently ransacked. He further testified that 30 cards of latent fingerprints were taken from the apartment and turned over to the identification section of the police department. He also indicated that there was no indication of forced entry. He testified, on cross-examination, that he did not detect any odor when he first entered the victim's apartment; however, when the body was being removed, he became aware of a distinct odor.
Doug Copeland, the manager of CNN Tire Warehouse, testified that he had *Page 498 
known the victim for approximately six to seven years before he came to Copeland for a job. Copeland testified that the victim had a drinking problem which caused him to miss work occasionally. He further testified that he had last seen the victim at work on Friday, February 21, 1986. He also indicated that prior to Friday, February 21, the victim had not worked since the preceding Saturday. Copeland further testified that the victim always kept money with him, usually in large amounts. The victim had been paid on the last Friday that he was seen at work and Copeland also stated that the victim kept approximately $200 in rolled coins in his apartment. Copeland testified, on cross-examination, that he went to the victim's apartment and knocked on the door every day that he was absent until Wednesday or Thursday. He further testified that the victim's car was not in the parking lot so he believed that the victim must be gone. Copeland, on redirect examination, described the victim's car as "an old dented four-door cream colored Chrysler."
Anthony Monroe Glover, nicknamed "Squirrel," testified that he worked with the appellant in demolition. He further testified that he rented his trailer out to the appellant during the time that the appellant was in Huntsville. He testified that on Saturday, February 22, the appellant came to the trailer, some time after 5 o'clock p.m., and picked up his clothes. The appellant told "Squirrel" that he was moving in "with Bill." "Squirrel" testified that he knew "Bill" to be the victim. The appellant arrived at the trailer in an automobile which "Squirrel" identified from photographs as being the victim's car. He testified that someone else was in the car whom he did not recognize.
Bill Smith testified that he knew the appellant from the Mission. Smith testified that he had noticed tattoos on the appellant's arms and that, although he was not certain, he believed the tattoo to be a reaper, i.e., a skull with a hood and sickle. Smith testified that the last time he saw the appellant was a Saturday night, which might have been February 22. The appellant arrived at Smith's trailer at approximately 11 o'clock p.m. in a car which Smith described as a dark four-door model with a dent on the passenger's side. Thereafter, Smith identified a photograph of the victim's car as being a photograph of the car the appellant was driving on that Saturday night. Smith testified that the appellant and he drove to a lounge, stayed for approximately two hours, and that then the appellant drove Smith back to his trailer. Smith testified that he had not seen the appellant or the automobile that he was driving since that night.
Dr. Eugene Hunt Scheuerman testified that he is a forensic pathologist with the Alabama Department of Forensic Sciences. He testified that he was called to the scene of the homicide on March 4. He testified that the victim's trousers were pulled part way down, his pockets were turned inside out, and he had a shirt fashioned into a ligature with a single overhand knot around his neck. He testified that there appeared to be some blunt force injuries to the victim's face and that the body was subject to "early decomposition" which was consistent with the body having been there for some period of time. Dr. Scheuerman further testified that he did not have an exact judgment as to how long the body might have been there, because many variable factors make such a determination difficult. He further testified that the cause of the victim's death was ligature strangulation. On cross-examination, Dr. Scheuerman testified that the victim's blood alcohol was .21 percent.
The victim's neighbor testified that he had met the victim twice. He testified that around the middle of February, he observed the victim and a young man carrying some boxes into his apartment. The neighbor identified the appellant as the young man helping the victim. He indicated that the appellant had a mustache and his hair was a little longer at that time. The neighbor further testified that the victim referred to the appellant as "son or sonny". The neighbor also stated that he passed the appellant on the sidewalk coming out of the apartments about a week later. The neighbor indicated that this occurred *Page 499 
on a Friday some time after 5 o'clock p.m.
Wanda Schiavone testified that she was employed by El Palacio Restaurant as cashier, hostess, and bookkeeper. She testified that the appellant was also employed as a cook at the restaurant back in February. She testified that on Saturday, February 22, the appellant was working and that he received a visit at the restaurant from an "older man." She observed the older man drink a beer as the appellant drank a cup of coffee, she said that and subsequently they talked on the telephone. The appellant asked to check out and clock out at 4:44 p.m. He left with the older man and returned at 6:14 p.m. alone. She testified that he clocked out at 11 o'clock p.m. and that she had not seen him since that night. She also testified that he never came back to pick up his pay checks, one for $30.49 and the other for $26.44.
Danny Lamont, of the Huntsville Police Department, testified that he was a latent fingerprint examiner. He testified that 38 fingerprint cards were recovered from the victim's apartment, but only nine were of value for comparison purposes. None of the fingerprints that Lamont had to work with matched those of the appellant. He further testified that subsequently he received an additional 29 cards of latent prints from a vehicle which had been found in Colorado. Lamont then indicated that of the three prints which were of value he was unable to identify any of them as belonging to the appellant.
Vernon Leroy Tolson testified that he was a police officer in Parker, Colorado. He identified photographs of a vehicle that was reported stolen from Alabama and found in a shopping center parking lot in Colorada. The vehicle had no license plates. Several other witnesses from Campo, Colorado, testified that they had observed the appellant and the victim's car in Campo, Colorado, on February 24.
James Parker, an investigator with the Huntsville Police Department, testified that he traveled to Parker, Colorado, in order to inspect and examine the automobile that the Parker police had impounded. Officer Parker identified the vehicle from photographs taken of the car in Parker, Colorado, and from photographs identifying the car as belonging to the victim. Subsequently, at trial, Parker was recalled to the stand to testify concerning an interview conducted with the appellant in the Madison County Jail. The appellant was advised of his rights; he indicated that he understood them and voluntarily agreed to talk to Parker. Parker testified that, while the appellant was in jail, his hair was somewhat longer and that he had a mustache. Parker testified that after the interview with the appellant, he read the notes he had taken back to the appellant and the appellant indicated that they were accurate. Parker testified as to the content of the appellant's statement. The appellant took the stand in his own behalf and testified to substantially the same facts.
The appellant, Brian Breeding, testified that he was known as Bill Pollard in Huntsville (William Harold Pollard). The appellant testified that on the last day of his employment at El Palacio, Bill Cobb, the victim, arrived at the restaurant looking for his friend Charlie Harris. Charlie refused to talk to the victim, who was "pretty drunk". The appellant asked for time off from work in order to drive the victim home. They arrived at the victim's house at approximately 6 o'clock p.m., whereupon the two went inside; the appellant consumed two beers and then telephoned for a taxi in order to get back to work. The victim gave the appellant $5.00 for the taxi, but when the cab arrived, the appellant kept the $5.00 and walked to work. The appellant got off work at approximately 12 o'clock midnight and then walked to Bill Smith's trailer. Bill Smith and he walked to a lounge where they drank and smoked some marijuana. They left the lounge and walked back to Bill's trailer. Thereafter, the appellant left and began walking to "Squirrel's" trailer. He hitchhiked a ride to the trailer with a man from Nashville, who was driving a new Mercedes-Benz. The appellant further stated that they stopped at "Squirrel's" trailer in order to get the appellant's clothes and tell "Squirrel" that he was leaving. He testified that *Page 500 
he left Huntsville because he had smoked the marijuana at the lounge. He expressed concern that he might be arrested for his escape from a minimum security prison in Michigan. He indicated that as a result of his escape, his picture had appeared in the newspaper. He also stated that he was originally incarcerated pursuant to a conviction for burglary in 1981. He testified that he hitchhiked from Nashville to St. Louis, Missouri, to Denver, Colorado. He stayed with his brother in Aurora, Colorado, and thereafter traveled to California. He testified that he did not have any knowledge of the victim's death until he was told about it in California. He testified that he did not drive the victim's car after he drove the victim home from the restaurant. He also stated that he had never been to Campo, Colorado, or seen any of the witnesses who identified him as having been there. He further testified that the television was not turned on in the victim's apartment when he left and that he never hit the victim, nor was he the cause of his death.
Although it is clear that the evidence presented by the State tends to connect the appellant to the crime of theft more directly than it does the offense of murder, there is sufficient circumstantial evidence from which a jury might reasonably exclude every hypothesis except that of guilt.Dolvin v. State, 391 So.2d 133, 139 (Ala. 1980).
 "In the prosecution of an accused for the offense of murder, the State must prove the corpus delicti which includes: (1) the death of the victim named in the indictment, and (2) that death was caused by the criminal agency of another. See Johnson v. State, 378 So.2d 1164
(Ala.Crim.App.), cert. quashed, 378 So.2d 1173 (Ala. 1979). The State must further show that the defendant caused the death of the victim and the intent to cause such death. Section 13A-6-2, Code of Alabama 1975. Intent may be inferred from the use of a deadly weapon. [Citations omitted.] Further, circumstantial evidence alone may be sufficient in conjunction with other facts and circumstances which tend to connect the accused with the commission of the crime to sustain a conviction."
Scanland v. State, 473 So.2d 1182, 1185 (Ala.Cr.App. 1985), cert. denied, Scanland v. Alabama,474 U.S. 1035, 106 S.Ct. 602, 88 L.Ed.2d 581 (1985).
 "Circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution. If facts are presented from which the jury may reasonably infer that the crime has been committed the question must be submitted to the jury and the other evidence tending to implicate the defendant is thereby rendered admissible."
Suggs v. State, 403 So.2d 309, 313 (Ala.Cr.App. 1981), cert. denied, 403 So.2d 313 (Ala. 1981), cert. denied,Suggs v. Alabama, 455 U.S. 938, 102 S.Ct. 1428,71 L.Ed.2d 548 (1982). See also Taylor v. State,405 So.2d 946 (Ala.Cr.App.), writ quashed, 405 So.2d 951 (Ala. 1981); Austin v. State, 434 So.2d 289, 291
(Ala.Cr.App. 1983); Todd v. State, 472 So.2d 707, 715
(Ala.Cr.App. 1985).
" 'It is not the province of this Court to substitute itself for the jury or usurp their function in weighing the evidence.' " Austin v. State, supra, at 291, quoting Dolvinv. State, supra.
 " 'When the evidence raises a question of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for acquittal, the refusal to give the affirmative charge, or the denial of a motion for new trial by the trial court do not constitute error.' Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Baker v. State, 338 So.2d 528 (Ala.Crim.App. 1976); Duncan v. State, 436 So.2d 883 (Ala.Crim.App. 1983). Further, '[a] verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this [c]ourt that it was wrong and unjust.' Ward v. State, 356 So.2d 238 (Ala.Crim.App.), cert. denied, 356 So.2d 242 (Ala. 1978); Johnson v. State, 378 So.2d 1164 (Ala.Crim.App.), *Page 501 
cert. quashed, 378 So.2d 1173 (Ala. 1979); Duncan, supra."
Scanland v. State, supra, at 1185.
The record reveals that on the last occasion at which the victim was seen alive, the appellant left to drive him home. The victim had been drinking on that night and the autopsy showed that his blood alcohol was .21 percent. The victim was apparently robbed and his car stolen. The car was found in Colorado, where the appellant had been observed with the vehicle by several witnesses. The appellant had left Huntsville without even going to pick up his paychecks. Although as noted earlier, we consider this to be borderline case, we feel that sufficient circumstantial evidence was presented to uphold the appellant's conviction for the offense of murder.
 II
The appellant charges that the trial court committed reversible error when it allowed the prosecution, on redirect, to question a witness who had testified as to the good general character of the appellant, about her knowledge of prior specific acts of misconduct committed by the appellant. The record indicates that during the cross-examination of State's witness, Wanda Schiavone, the defense asked the witness if she had an opinion as to the appellant's general reputation in the community. The witness responded that his reputation was "good" and, subsequently, when asked if she had a judgment as to whether or not the appellant committed this crime, she responded that she did not believe that he did. During the re-direct examination of the witness, the following transpired:
 "[Prosecutor]: Your Honor, as I understand, [Defense Counsel] asked about general reputation. That opens the door for me to ask about any prior convictions.
"THE COURT: Sure.
". . .
 "[Prosecutor]: Are you aware in January of 1982, that the defendant here, Brian Breeding, was charged with a felony offense in the state of Michigan?
"A. Yes.
"Q. Okay.
"A. I know it now, I didn't know it then.
 "Q. All right. And are you aware that some time prior to January of 1982, he has been charged with the offense of escape from the state of Michigan?
 "[Defense Counsel]: I object, Your Honor, he is bringing up a crime of which there is no conviction or no prosecution.
 "THE COURT: Well, I believe he is entitled to make inquiry. I sustain it, because the form of the question is improper, it's improperly phrased, but otherwise he has a right to pursue the matter, if he does so in a proper manner.
 "Q. Mrs. Schiavone, based on what you know now, does that have any bearing on your opinion as to his general reputation?
"A. Well, yes, I just —
"Q. Do you still think his reputation is good?
"A. Well, no."
No further objection was made by the defense counsel on re-direct. On re-cross-examination, the following occurred:
 "[Defense Counsel]: Mrs. Schiavone, now that you have been made aware that he has been convicted of a crime, does that — what does that mean to you now, what impression does that give to you regarding his character and the events which took place in this matter as you know them?
 "A. Well, he got in trouble and got in prison, and he has escaped. I mean, you know —
". . .
 "Q. After knowing that he has been convicted of a felony crime, do you still hold the opinion that you don't think that Brian committed the crime in this instance?
"A. Murder, no.
"Q. You don't think he did it?
"A. No."
The appellant argues that after the witness had testified to the general good reputation of the appellant, the prosecution could have properly asked the witness *Page 502 
whether, prior to the time of the alleged offense, she had heard reports, rumors or statements derogatory to the accused. However, the appellant contends that it was improper for the State to prove the appellant's bad character by asking about a prior specific bad act, i.e., escape. We note, without ruling on the validity of the appellant's argument, that this issue has not been preserved for our review. The defense counsel made one objection on the basis that the prosecutor brought "up a crime of which there is no conviction or no prosecution." The defense counsel, in so doing, waived all grounds of objection which were not specified. Blackmon v. State,449 So.2d 1264 (Ala.Cr.App. 1984). Furthermore, the trial court sustained the defense counsel's objection, noting that the form of the question was improperly phrased. Bell v. State,466 So.2d 167 (Ala.Cr.App. 1985) (where the appellant's objection was sustained and no adverse ruling given, the matter could not be raised on appeal). However, as the trial court indicated, had the prosecutor properly phrased the question, inquiry as to the accused's prior specific bad acts can be justified on the basis that it tests the credibility of the character witness.
 "[I]f a witness testifies at the calling of the accused to the accused's good general reputation as a whole, the state, on cross-examination, may ask such witness whether, prior to the time of the alleged offense, he heard reports, rumors or statements derogatory of the accused. This allowance for the state to introduce testimony of the accused's prior specific bad acts is justified upon the basis that such tests the credibility of the character witness — i.e., it tests whether he does indeed know the accused's good general reputation. If there are existing rumors of bad conduct, of which the witness is unaware, then the inference is to be drawn that he does not know the accused's general reputation since it is a composite of what people are saying about the accused. Whenever the State utilizes this method of introducing prior specific bad acts, the attorney for the accused should move for an instruction to and ultimately a charge to the jury that they can only consider the existence of such prior acts in testing the credibility of the character witness and that they cannot consider such acts as they might reflect upon the character of the accused."
C. Gamble, McElroy's Alabama Evidence, § 27.01(5) (3d ed. 1977). Although the prosecutor's subsequent question ("based on what you know now, does that have any bearing on your opinion as to his general reputation?") was arguably improper, the defense counsel made no further objections.Turner v. State, 473 So.2d 639 (Ala.Cr.App. 1985).
 III
The appellant contends that the trial court committed reversible error when it allowed testimony regarding a photographic lineup which had not been produced by the State in compliance with the court's discovery order. The record indicates that Sheriff Willard Goff, of Springfield, Colorado, testified that he assisted in this investigation by attempting to locate witnesses. He testified that he received a photographic lineup in the mail which he took to the different witnesses in order to secure an identification. When this information was introduced at trial, the defense counsel approached the bench and stated that the pictures were not turned over to the appellant in compliance with the discovery order and that he had had no knowledge that the pictures existed. The court responded by offering the defense counsel an opportunity to examine the photographs at trial or to give him "some time to do whatever it is that you would like to do with it." The prosecutor indicated that he had told the defense counsel about the photographs and that it was his understanding that defense counsel had been given an opportunity to examine every photograph by the Huntsville Police Department. The trial court overruled defense counsel's objection.
The State's delayed disclosure of lineup information did not constitute reversible error. The evidence was subject to a "thorough and sifting cross-examination." *Page 503 Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963). Further, the trial court offered the opportunity to the defense counsel to examine the lineup. See Alabama Temporary Rules of Criminal Procedure, Rule 18.5. As the Alabama Supreme Court stated in Ex parte Raines,429 So.2d 1111, 1113-14 (Ala. 1982), cert. denied, Rainesv. Alabama, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368
(1983):
 "Even in the case of total nondisclosure, the information must create a reasonable doubt where one did not otherwise exist. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The defendant's burden is to show that reasonable doubt 'not as a matter of speculation, but as a demonstrable reality.' Beck v. Washington, 369 U.S. 541, 558, 82 S.Ct. 955, [964], 964, 8 L.Ed.2d 98 (1962). We agree with the Court of Criminal Appeals that the appellant has failed to show how he was actually harmed by the delayed disclosure of the information. Appellant's argument that the information would have enabled more effective preparation for trial was rejected in United States v. Agurs, supra, 427 U.S. at 112 n. 20, 96 S.Ct. at 2401 n. 20 . . . Therefore, the proper focus is upon the materiality in the nondisclosure or delayed disclosure of exculpatory information in determining the denial vel non of defendant's rights of due process and fair trial — a showing not made by this defendant."
 IV
The appellant argues that the trial court committed reversible error in its instructions to the jury regarding the presumption of innocence. The record indicates that the trial judge charged the jury as follows:
 "The defendant enters into the trial of this case presumed to be innocent, and that presumption attends him both as a matter of law and as a matter of evidence throughout the stages of the trial, until such time as the jury is or becomes convinced beyond a reasonable doubt and to a moral certainty of his guilt." (In pertinent part.)
The appellant quotes two instructions concerning the presumption of innocence from Alabama Pattern JuryInstructions — Criminal (1980) as follows:
 "The Defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberation on the verdict, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the Defendant is guilty.
 "The presumption of innocence with which the Defendant enters into the trial is a fact in the case which must be considered with all the evidence and is not to be disregarded by you."
Instruction III-B-2, Alabama Pattern Jury Instructions— Criminal (1980). The alternative instruction, III-B-2(A), states:
 "When a Defendant is placed on trial charged with the commission of a public offense the law says that he is presumed to be innocent of the defense. This Defendant enters this trial with the presumption of innocence in his favor, and it is a fact which is to be considered as evidence, and should not be disregarded. And this presumption of innocence remains with the Defendant during the trial until overthrown by evidence which convinces [you] of the Defendant's guilt beyond a reasonable doubt."
The appellant specifically charges that the trial court erred by failing to charge the jury "that the legal presumption of innocence was a matter of evidence and should be regarded as such by the jury in the Defendant's behalf during theirdeliberations." (Emphasis provided in appellant's brief.) The appellant cites Biggs v. State, 411 So.2d 813
(Ala.Cr.App. 1981), to support this contention. Initially, we note that the second pattern jury instruction provided by the appellant does not include the specification of "during their deliberations." Nor did the court in Biggs intend that the terminology "during their deliberations" be required language in every instruction on the legal presumption of innocence. In Grace v. State, 456 So.2d 862
(Ala.Cr.App. 1984), this Court found that the trial judge's oral charge to the jury concerning the presumption of innocence substantially covered the necessary principles *Page 504 
of law and that charge contained no language requiring that the jury consider the presumption of innocence as evidence in the appellant's behalf during their deliberations.
 "We are satisfied that the court gave a clear instruction to the jury as regards the presumption of innocence. In fact, the record indicates that the court charged them twice on the presumption of innocence. Cases regarding the niceties of particular language in a charge bring to mind the lawyers' lament that jury charges are directed toward the appellate courts, rather than the jury."
Id. at 864.
 "[I]t is the charge in its totality and not some 'magic words' that must determine whether the defendant's rights have been protected or error committed. In the present case the defendant was certaintly protected and his right to the presumption of innocence was adequately put before the jury."
Ex parte Carroll, 407 So.2d 177, 179 (Ala. 1981). We find no error in the trial judge's instructions to the jury that the presumption of innocence was evidence to be considered by the jury throughout "all stages of the trial ", which surely includes the deliberation stage.
AFFIRMED.
All the Judges concur.